In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 18-2569
APRIL HUGHES, et al.,
 Plaintiffs-Appellants,
 v.

NORTHWESTERN UNIVERSITY, et al.,
 Defendants-Appellees.
 ____________________

 Appeal from the United States District Court for the
 Northern District of Illinois, Eastern Division.
 No. 1:16-cv-08157 — Jorge L. Alonso, Judge.
 ____________________

 ARGUED NOVEMBER 29, 2022 — DECIDED MARCH 23, 2023
 ____________________

 Before SYKES, Chief Judge, and HAMILTON and BRENNAN,
Circuit Judges.
 BRENNAN, Circuit Judge. On remand from Hughes v. North-
western University, 142 S. Ct. 737 (2022), we reexamine plain-
tiﬀs’ allegations that plan ﬁduciary Northwestern breached
its duty of prudence under the Employee Retirement Income
Security Act, 29 U.S.C. § 1104(a). Following Hughes, we dis-
cern three claims of breach that require reconsideration: that
Northwestern (1) failed to monitor and incurred excessive
2 No. 18-2569

recordkeeping fees, (2) failed to swap out retail shares for
cheaper but otherwise identical institutional shares, and
(3) retained duplicative funds. We conclude that the ﬁrst two
claims survive dismissal and remand them for further pro-
ceedings. For all other claims and issues, we reinstate this
court’s prior judgment in Divane v. Northwestern University,
953 F.3d 980 (7th Cir. 2020).
 I. Background
 A. Factual Background
 Plaintiﬀs are individuals who participate in two deﬁned-
contribution plans subject to ERISA: the Northwestern Uni-
versity Retirement Plan and the Northwestern University
Voluntary Savings Plan (the “Plans”). Subject to I.R.C.
§ 403(b), the Plans provide for tax-deferred contributions to
retirement accounts by employees of I.R.C. § 501(c)(3) non-
proﬁts like defendant Northwestern University. As deﬁned-
contribution plans, the Plans allow participants to direct the
investment of their contributions. But the investment options
included in the Plans are selected by the Plans’ ﬁduciary.
Northwestern University, as the employer, is the administra-
tor and ﬁduciary of the Plans. The university assigned some
of its ﬁduciary administrative duties to two Northwestern of-
ﬁcers, the Northwestern University Retirement Investment
Committee, and its members. We refer to these ﬁduciary de-
fendants collectively as “Northwestern” or “the university.”
 Northwestern selected various investment options oﬀered
by the Teachers Insurance and Annuity Association of Amer-
ica and College Retirement Equities Fund (“TIAA”) and the
Fidelity Management Trust Company (“Fidelity”) to be in-
cluded in the Plans. Before October 2016, the Retirement Plan
No. 18-2569 3

and the Savings Plan oﬀered over 240 and 180 investment op-
tions, respectively, from TIAA and Fidelity. For example, the
TIAA Traditional Annuity, a ﬁxed annuity contract that re-
turns a contractually speciﬁed minimum interest, is a popular
investment option in the Plans. This annuity has restrictions
and penalties for withdrawal, including a 2.5% surrender
charge if a participant withdraws the investment in a lump
sum sooner than 120 days after the termination of her employ-
ment. TIAA’s policy also requires any plan oﬀering the
Traditional Annuity to use TIAA as a recordkeeper for its
products.
 In October 2016, Northwestern streamlined its investment
options by greatly reducing the Plans’ oﬀerings to 32 invest-
ment options spread across four tiers: target date mutual
funds, index funds, actively managed funds, and a self-di-
rected brokerage window. Leading up to this change, North-
western informed its plan participants that this new tiered
structure would “enable simpler decisionmaking,”
“[r]educe[] administration fees,” “increase[] participant re-
turns,” and provide “[a]ccess to lower cost share classes when
available.” Northwestern acknowledged that this restructur-
ing better aligned it with its peers who had reduced their in-
vestment line-ups.
 B. Procedural Background
 Plaintiﬀs ﬁled suit alleging various ERISA violations. The
First Amended Complaint—the operative pleading—asserts
three violations of the duty of prudence under 29 U.S.C.
§ 1104(a)(1) (Counts I, III, & V), three counts of ERISA-
prohibited transactions under 29 U.S.C. § 1106(a)(1) (Counts
II, IV, & VI), and a claim against Northwestern University and
two oﬃcers for failure to monitor ﬁduciaries (Count VII).
4 No. 18-2569

 Count III alleges a breach of ﬁduciary duty by Northwest-
ern for incurring unreasonable recordkeeping fees. Among
other things, plaintiﬀs aver that Northwestern paid about
four to ﬁve times a reasonable per-participant recordkeeping
fee for the Plans in aggregate by paying for recordkeeping ser-
vices through uncapped revenue-sharing arrangements. Rev-
enue sharing allows fund providers to take a percentage of
the revenue from plan participants’ investments to defray the
participants’ recordkeeping and other administrative costs.
Per plaintiﬀs, Northwestern should have lowered its expenses
by consolidating from two recordkeepers to one, soliciting
bids from competing providers, and using the massive size
and correspondent bargaining power of the Plans to negotiate
for fee rebates.
 Count V alleges a breach of ﬁduciary duty by Northwest-
ern’s failure to monitor the Plans’ investments and to remove
imprudent ones. As part of this claim, plaintiﬀs maintain that
the Plans contained too many funds and caused investor con-
fusion, and that Northwestern should have removed duplica-
tive funds that did nothing but add expenses to the Plans.
According to plaintiﬀs, Northwestern should have used its
size and bargaining power to replace retail-class shares of
funds with cheaper but otherwise identical institutional-class
shares of the same funds.
 The district court granted Northwestern’s motion to dis-
miss plaintiﬀs’ First Amended Complaint. Relevant to this re-
mand, the court dismissed Count III (excessive recordkeeping
fees) ﬁnding that, under Seventh Circuit precedent, North-
western did not violate ERISA by using revenue sharing for
plan expenses. The court observed that it was not apparent
that the Plans could have arranged for lower fees. In any case,
No. 18-2569 5

the court found that plan participants had options to keep
their expenses low by investing in low-expense funds that
were available in the Plans. The district court also dismissed
Count V (imprudent funds retention) because the Plans of-
fered the low-expense funds desired by plaintiﬀs and found
irrelevant that the Plans oﬀered additional funds plaintiﬀs did
not want to choose. In the same order, the district court de-
nied plaintiﬀs’ April 2018 motion for leave to amend their
complaint, concluding that the proposed amendments were
untimely and futile.
 Following this dismissal, the district court also denied
plaintiﬀs’ June 2018 motion to amend judgment and, in the
alternative, for leave to ﬁle a proposed Second Amended
Complaint. The proposed complaint largely mirrored the
First Amended Complaint, but it added certain alleged
admissions from Northwestern’s executives and an outside
consultant. These additions bolstered the plausibility of the
existing Counts III and V. The new Count VII repackaged
pleadings in Count V and claimed breach of ﬁduciary duty by
Northwestern’s failure to replace retail-class shares with in-
stitutional-class shares. Otherwise, Counts III and V remained
identical in the operative and proposed complaints.
 This court aﬃrmed the district court’s dismissal and
denial of leave to amend in Divane, 953 F.3d 980, largely
adopting its reasoning. The dismissal on Count III was af-
ﬁrmed because plaintiﬀs failed to support their claim that a
ﬂat-fee structure—as opposed to revenue-sharing—is re-
quired by ERISA or would beneﬁt plan participants. Id. at 989.
This court also held that ERISA does not require Northwest-
ern to use a single recordkeeper and observed that plaintiﬀs
had failed to allege that participants would have been better
6 No. 18-2569

oﬀ in such an arrangement. Id. at 990. Plaintiﬀs had also failed
to identify an alternative low-cost recordkeeper who would
supply comparable recordkeeping services. Id. at 991.
 Similarly, this court aﬃrmed the dismissal on Count V
because the Plans oﬀered some low-expense funds that “elim-
inat[ed] any claim that plan participants were forced to stom-
ach an unappetizing menu.” Id. Prior Seventh Circuit cases—
Loomis v. Exelon Corp., 658 F.3d 667, 673–74 (7th Cir. 2011), and
Hecker v. Deere & Co., 556 F.3d 575, 586 (7th Cir. 2009)—were
relied upon for the proposition that “plans may generally of-
fer a wide range of investment options and fees without
breaching any ﬁduciary duty.” Divane, 953 F.3d at 992. The
district court’s dismissal of other claims, denial of leave to
amend, and rejection of Plaintiﬀs’ jury demand were also af-
ﬁrmed. Id. at 993–94.
 Plaintiﬀs petitioned for certiorari on only Counts III and V
of the First Amended Complaint. 1 The certiorari petition did
not include plaintiﬀs’ other claims, the jury demand issue, or
the denial of leave to amend. Petition for Writ of Certiorari,
Hughes v. Nw. Univ., No. 19-1401. The Supreme Court granted
certiorari, vacated the judgment, and remanded the case for
reconsideration. Hughes, 142 S. Ct. 737. The Court rejected this
court’s reliance on a “categorical rule” that providing some
low-cost options eliminates concerns about other investment
options being imprudent. Id. at 740. We were directed to
reevaluate plaintiﬀs’ allegations based on the duty of pru-
dence articulated in Tibble v. Edison International, 575 U.S. 523

 1 Laura Divane did not participate in this petition and is no longer

pursuing this appeal. So, April Hughes became the lead plaintiff and ap-
pellant, resulting in the changed caption.
No. 18-2569 7

(2015), applying the pleading standard discussed in Ashcroft
v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly,
550 U.S. 544 (2007). Hughes, 142 S. Ct at 742.
 II. Impact of Hughes
 A. Scope of Remand
 The Supreme Court identiﬁed three ways in which plain-
tiﬀs pleaded that Northwestern violated the duty of
prudence: (1) “respondents allegedly failed to monitor and
control the fees they paid for recordkeeping”; (2) “respond-
ents allegedly oﬀered a number of mutual funds and annui-
ties in the form of ‘retail’ share classes that carried higher fees
than those charged by otherwise identical ‘institutional’ share
classes of the same investments”; and (3) “respondents alleg-
edly oﬀered too many investment options … and thereby
caused participant confusion and poor investment decisions.”
Id. at 741. The ﬁrst allegation relates to Count III, and the sec-
ond and third to Count V.
 Plaintiﬀs acknowledge that they are not rearguing the jury
demand issue. In their briefs on remand, they ask to relitigate
only Counts III and V of the First Amended Complaint,
stating: “Northwestern imprudently incurred excessive
recordkeeping fees” (Count III); “Northwestern provided
higher-cost retail-class shares when identical lower-cost insti-
tutional-class shares of the same funds were available”
(Count V); and “Northwestern imprudently retained exces-
sively duplicative funds” (Count V).
 Grounds not argued on appeal are waived. Bordelon v. Bd.
of Educ. of the City of Chi., 811 F.3d 984, 991 (7th Cir. 2016) (ci-
tation omitted). And generally, issues that were not argued
before the Supreme Court are not encompassed within a
8 No. 18-2569

remand from the Court. See United States v. Husband, 312 F.3d
247, 250 (7th Cir. 2002) (citations omitted) (“[A]ny issue that
could have been but was not raised on appeal is waived and
thus not remanded.”); Buckley v. Fitzsimmons, 952 F.2d 965, 967
(7th Cir. 1992) (“But this topic was not raised in the Supreme
Court … and so is not encompassed within the remand.”),
rev’d on other grounds, 509 U.S. 259 (1993); 18B CHARLES ALAN
WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND
PROCEDURE § 4478.3 (3d ed. 2022) (explaining the “Law of the
Case—Mandate Rule”). But if the opinion on appeal identiﬁes
an error that implicates and requires redetermination of other
issues not raised on appeal, we may consider them. See Hus-
band, 312 F.3d at 251.
 Because plaintiﬀs did not petition for certiorari on and
have not reargued the following issues on remand, we do not
reconsider them: the TIAA products claim (Count I), the pro-
hibited transactions claims (Counts II, IV, and VI), and the
jury demand issue. Nothing in Hughes undercuts the bases on
which this court previously resolved these claims and issue,
so we reinstate this court’s prior decisions on them. See gener-
ally United States v. Romero, 528 F.3d 980, 981 (7th Cir. 2008)
(reinstating holdings not implicated by the Supreme Court’s
remand).
 Plaintiﬀs do ask us to remand for reconsideration their re-
quest for leave to ﬁle their Second Amended Complaint.
While we agree that Hughes may strengthen the plausibility of
the recordkeeping, share-class, and duplicative funds claims
in the proposed Second Amended Complaint, ultimately, we
need not grant this request because we rule that the analogous
counts in the First Amended Complaint state plausible claims
for relief. The other counts in the proposed Second Amended
No. 18-2569 9

Complaint 2 are not implicated by Hughes, so we do not recon-
sider granting leave to amend for those claims. For those
counts, we reinstate this court’s former decision aﬃrming the
district court’s denial of leave to amend.
 B. Impact on Loomis and Hecker
 Hughes abrogated a line of reasoning derived from Loomis,
658 F.3d 667, and Hecker, 556 F.3d 575. The Supreme Court
rejected this court’s reliance on a categorical rule that Count
V failed because plaintiﬀs’ “preferred type of low-cost invest-
ments were available as plan options.” Hughes, 142 S. Ct. at
740; see Divane, 953 F.3d at 991–92. Put another way, “ERISA
does not allow the soundness of investments A, B, and C to
excuse the unsoundness of investments D, E, and F.” Albert v.
Oshkosh Corp., 47 F.4th 570, 575 (7th Cir. 2022). The duty of
prudence requires a ﬁduciary to assess the prudence of each
investment both individually and relative to the entire plan.
 Hughes negates some of the reasoning developed in Hecker
and Loomis and employed in Divane. See Forman v. TriHealth,
Inc., 40 F.4th 443, 452 (6th Cir. 2022) (“Hecker and Loomis dis-
missed imprudence claims in part because the retirement plan
under review oﬀered a range of options, including some that

 2 “Aside from … four new counts, the second amended complaint

mirrored the causes of action and claims in the amended complaint. The
four new counts alleged that Northwestern: (1) offered retail class funds
as investment options instead of using their bargaining power to offer in-
stitutional class shares at lower prices; (2) violated Northwestern’s Invest-
ment Policy Statement by failing to monitor investment performance and
recordkeeping costs; and (3) allowed TIAA to access and use participant
information to market its services to participants.” Divane, 953 F.3d at 985.
Hughes does not impact the district court’s findings of futility and undue
delay as to Counts VIII, IX, and X.
10 No. 18-2569

were less expensive than the challenged retail mutual fund
shares. Hughes rejected that bright-line rule, precluding us
from evaluating these employees’ claims under it.”). Hecker
relied in part on the “wide range of expense ratios” in a plan
to dismiss a claim that a plan ﬁduciary provided investment
options with excessive fees. 556 F.3d at 586. Loomis, too, em-
ployed this reasoning to reject a share-class claim. 658 F.3d at
670. In Divane, this court also depended on the fact that North-
western had provided a “wide range of investment options”
in rejecting Count V. 953 F.3d at 992. As this court has recog-
nized in recent decisions, Hughes says providing a diverse
menu of investments alone is not dispositive that a plan ﬁdu-
ciary has fulﬁlled the duty of prudence. Albert, 47 F.4th at
579-80; Dean v. Nat’l Prod. Workers Union Severance Tr. Plan, 46
F.4th 535, 548–49 n.4 (7th Cir. 2022).
 Still, Hughes left untouched three principles from Loomis
and Hecker. The ﬁrst is that the use of revenue sharing for plan
expenses does not amount to a per se violation of ﬁduciary
duty under ERISA. Hecker, 556 F.3d at 585. This goes to Count
III (excessive recordkeeping fees). But this principle does not
foreclose the possibility of violating a ﬁduciary duty by failing
to monitor and incur only reasonable expenses. Plan ﬁduciar-
ies have a continuing duty to monitor their expenses to make
sure that they are not excessive with respect to the services
received. See Tibble v. Edison Int’l, 843 F.3d 1187, 1197 (9th Cir.
2016) (“[A] trustee is to ‘incur only costs that are reasonable
in amount and appropriate to the investment responsibilities
of the trusteeship.’”(quoting RESTATEMENT (THIRD) OF TRUSTS
§ 90(c)(3))); Tibble v. Edison Int’l, 575 U.S. 523, 525 (2015). 3

 3 The Tibble litigation has a lengthy procedural history. For our pur-

poses, its two most relevant opinions are the Supreme Court’s decision
No. 18-2569 11

Switching from a revenue-sharing to a per capita expense
model may in some cases be a proper means of reining in ex-
cessive expenses. But Hughes does not state that revenue shar-
ing is an impermissible expense arrangement.
 The second principle is that “nothing in ERISA requires
every ﬁduciary to scour the market to ﬁnd and oﬀer the
cheapest possible fund.” Hecker, 556 F.3d at 586; Loomis, 658
F.3d at 670. This primarily goes to Count V (imprudent fund
retention) but does not account for the share-class claim em-
bedded within Count V. This principle does not address the
duty of a ﬁduciary when it has access to a cheaper but other-
wise identical fund from the same fund provider. ERISA re-
quires a ﬁduciary to assess whether a given fund is prudent
in light of other investment options in a plan, comparable
funds, and the expenses charged, among other factors. See
Tibble, 575 U.S. at 529–30.
 Also, the second principle accords with this court’s prior
conclusion about Count III that “Northwestern was not re-
quired to search for a recordkeeper willing to take $35 per
year per participant as plaintiﬀs would have liked.” Divane,
953 F.3d at 990–91. In Albert, this court read this portion of
Divane as “reject[ing] the notion that a failure to regularly so-
licit quotes or competitive bids from service providers
breaches the duty of prudence.” 47 F.4th at 579. Albert

vacating the judgment of the Ninth Circuit in Tibble v. Edison International,
575 U.S. 523 (2015), and the Ninth Circuit’s en banc decision following re-
mand from the Court in Tibble v. Edison International, 843 F.3d 1187 (9th
Cir. 2016). The former explained the continuing duty to monitor invest-
ments within the duty of prudence, and the latter expounded upon this
duty with regards to plan expenses. We distinguish the cases by their re-
porter designations.
12 No. 18-2569

determined that Hughes left this portion of Divane untouched.
See id. at 579–80. While true, Hughes directed us to reconsider
plaintiﬀs’ allegations concerning excessive recordkeeping
fees in light of the continuing duty to monitor such fees stated
in Tibble, 575 U.S. 523. Hughes, 142 S. Ct at 742. We reaﬃrm
that a ﬁduciary need not constantly solicit quotes for record-
keeping services to comply with its duty of prudence. But ﬁ-
duciaries who fail to monitor the reasonableness of plan fees
and fail to take action to mitigate excessive fees—such as by
adjusting fee arrangements, soliciting bids, consolidating
recordkeepers, negotiating for rebates with existing record-
keepers, or other means—may violate their duty of prudence.
 The third principle is that plans may generally oﬀer a wide
range of investment options and fees without breaching any
ﬁduciary duty. Loomis, 658 F.3d at 673–74; Hecker, 556 F.3d at
586. Nothing in Hughes undercuts this general proposition,
but as mentioned earlier, the Supreme Court rejected this
court’s reliance on a categorical rule that a plan ﬁduciary may
avoid liability by assembling a diverse menu of investment
options that includes the types of investments a plaintiﬀ de-
sires. Hughes, 142 S. Ct. at 741–42.
 III. Pleading Standard
 Before evaluating whether plaintiﬀs have stated a claim in
Counts III and V, we must specify the correct pleading stand-
ard for a breach of the duty of prudence under ERISA. Hughes
oﬀers some guidance but stops short of pronouncing a con-
crete standard. The Court directed us to “consider whether
petitioners have plausibly alleged a violation of the duty of
prudence as articulated in Tibble,” 575 U.S. 523, applying the
pleading standard from Iqbal and Twombly. Hughes, 142 S. Ct.
at 742. The Court then quoted Fifth Third Bancorp v.
No. 18-2569 13

Dudenhoeﬀer, 573 U.S. 409, 425 (2014), stating that the inquiry
into the duty of prudence is “context speciﬁc.” Id. The Court
concluded with a sentence, the meaning of which the parties
debate. We ﬁrst address the duty of prudence articulated in
Tibble, 575 U.S. 523, and then determine the pleading stand-
ard.
 A. Duty of Prudence
 Under the duty of prudence mandated in ERISA, a plan
ﬁduciary is required to “discharge his duties with respect to
a plan … with the care, skill, prudence, and diligence under
the circumstances then prevailing that a prudent man acting
in a like capacity and familiar with such matters would use in
the conduct of an enterprise of a like character and with like
aims.” 29 U.S.C. § 1104(a)(1). “In determining the contours of
an ERISA ﬁduciary’s duty, courts often must look to the law
of trusts.” Tibble, 575 U.S. at 528–29. The Supreme Court has
stated that “a trustee has a continuing duty to monitor trust
investments and remove imprudent ones … separate and
apart from the trustee’s duty to exercise prudence in selecting
investments at the outset.” Id. at 529. “If the ﬁduciaries fail to
remove an imprudent investment from the plan within a rea-
sonable time, they breach their duty.” Hughes, 142 S. Ct. at 742
(citing Tibble, 575 U.S. at 529–30). This continuing duty to
monitor is a subset of the duty of prudence, Tibble, 575 U.S. at
529–30, and includes two related components.
 First, the duty of prudence requires a plan ﬁduciary to sys-
tematically review its funds both at the initial inclusion of a
particular fund in the plan and at regular intervals to deter-
mine whether each is a prudent investment. Id. at 529 (“[T]he
trustee must ‘systematic[ally] conside[r] all the investments
of the trust at regular intervals’ to ensure that they are
14 No. 18-2569

appropriate.” (quoting AMY MORRIS HESS, GEORGE GLEASON
BOGERT, & GEORGE TAYLOR BOGERT, BOGERT’S LAW OF TRUSTS
AND TRUSTEES § 684, at 147–48 (3d ed. 2009) (“BOGERT’S LAW
OF TRUSTS”)); AUSTIN WAKEMAN SCOTT, MARK L. ASCHER, &
WILLIAM FRANKLIN FRATCHER, SCOTT AND ASCHER ON TRUSTS
§§ 19.3, 19.4 (6th ed. 2022) (“SCOTT ON TRUSTS”). “‘Managing’
embraces monitoring, that is, the trustee’s continuing respon-
sibility for oversight of the suitability of investments already
made as well as the trustee’s decisions respecting new invest-
ments.” UNIF. PRUDENT INVESTOR ACT § 2, cmt. (UNIF. L.
COMM’N 1995); Tibble, 575 U.S. at 529. “When the trust estate
includes assets that are inappropriate as trust investments, the
trustee ordinarily has a duty to dispose of them within a rea-
sonable time.” SCOTT ON TRUSTS § 19.3.1; see also BOGERT’S LAW
OF TRUSTS § 685; Tibble, 575 U.S. at 529–30.

 Second, the duty of prudence requires a plan ﬁduciary to
“incur only costs that are reasonable in amount and appropri-
ate to the investment responsibilities of the trusteeship.” Tib-
ble, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS
§ 90(c)(3)); see also Sweda v. Univ. of Pa., 923 F.3d 320, 328 (3d
Cir. 2019) (“Fiduciaries must also understand and monitor
plan expenses.”); Davis v. Washington Univ. in St. Louis, 960
F.3d 478, 483 (8th Cir. 2020) (discussing a ﬁduciary’s duty to
keep plan expenses under control). “Expenses, such as man-
agement or administrative fees, can sometimes signiﬁcantly
reduce the value of an account in a deﬁned-contribution
plan.” Tibble, 575 U.S. at 525. So “cost-conscious management
is fundamental to prudence in the investment function,” and
should be applied “not only in making investments but also
in monitoring and reviewing investments.” RESTATEMENT
(THIRD) OF TRUSTS § 90, cmt. B; see also id. § 88, cmt. A (“Im-
plicit in a trustee’s ﬁduciary duties is a duty to be cost-
No. 18-2569 15

conscious.”). “Wasting beneﬁciaries’ money is imprudent.”
UNIF. PRUDENT INVESTOR ACT § 7, cmt. (UNIF. L. COMM’N
1995).
 The duty to monitor stated in Tibble, 575 U.S. 523, will in-
form our analysis of Counts III and V. But Tibble “express[ed]
no view on the scope of … ﬁduciary duty” and identiﬁed no
pleading standard for a violation of that duty. Id. at 531. Tibble
involved summary judgment and ﬁndings following a bench
trial—not a motion to dismiss—so its relevance is limited in
determining what allegations survive a motion to dismiss. Id.
at 523.
 B. Dudenhoeﬀer’s Reach
 The parties dispute the meaning of the last sentence in
Hughes: “At times, the circumstances facing an ERISA ﬁduci-
ary will implicate diﬃcult tradeoﬀs, and courts must give due
regard to the range of reasonable judgments a ﬁduciary may
make based on her experience and expertise.” 142 S. Ct. at 742.
This sentence is preceded by the citation to Dudenhoeﬀer, 573
U.S. at 425, quoting that the content of the duty of prudence
is “context speciﬁc.” Hughes, 142 S. Ct. at 742. Plaintiﬀs read
Hughes’s last sentence as dicta and not as a part of the stand-
ard to plead a violation of the duty of prudence. In contrast,
Northwestern reads the sentence as incorporating Dudenhoef-
fer’s heightened pleading standard, namely that “a plaintiﬀ
must plausibly allege an alternative action that the defendant
could have taken … that a prudent ﬁduciary in the same cir-
cumstances would not have viewed as more likely to harm
the fund than to help it.” 573 U.S. at 428. For Northwestern,
that means plaintiﬀs must plead that an alternative prudent
action which the ﬁduciary should have taken was “actually
16 No. 18-2569

available” and that plaintiﬀs must “rule out reasonable expla-
nations” for failure to take that action.
 Dudenhoeﬀer involved an employee stock ownership plan
(ESOP) in which ﬁduciaries allegedly had negative inside in-
formation about the stock the plan contained. Id. at 412–13.
The duty of prudence there involved a conﬂict between the
ﬁduciary’s knowledge of negative inside information about
the stock versus the ﬁduciary’s adherence to insider trading
laws and a reasonable belief that halting stock purchases
“would do more harm than good to the fund by causing a
drop in the stock price.” Id. at 428–30. This unique tradeoﬀ
caused the Supreme Court to set a heightened pleading stand-
ard for that case. The Court also limited the higher standard
to claims for breach of the duty of prudence based on inside
information by ﬁduciaries of an ESOP. 573 U.S. at 428. Since
Dudenhoeﬀer, the Court has reaﬃrmed that the case “set forth
the standards for stating a claim for breach of the duty of pru-
dence against ﬁduciaries who manage employee stock own-
ership plans (ESOPs).” Amgen Inc. v. Harris, 577 U.S. 308, 309
(2016).
 Northwestern overreads the reference in Hughes to Duden-
hoeffer as adopting that case’s heightened pleading standard.
Rather, the citation in Hughes to Dudenhoeffer signals that the
duty of prudence inquiry is “context specific,” but no more.
Because this case does not involve an ESOP, Dudenhoeffer’s
standard does not apply. But the context specific inquiry is
key. It is in this light that we read the Supreme Court’s di-
rective to recognize the “difficult tradeoffs” that an ERISA fi-
duciary faces, and the “range of reasonable judgments” that
may be made, and to consider alternative explanations for the
fiduciary conduct complained of. But as we discuss next,
No. 18-2569 17

these alternative explanations need not be conclusively ruled
out at the pleadings stage.
 C. Contours of the Pleading Standard
 Plausibility is the basic test for pleadings on a motion to
dismiss. A plaintiﬀ’s “[f]actual allegations must be enough to
raise a right to relief above the speculative level on the as-
sumption that all allegations in the complaint are true.”
Twombly, 550 U.S. at 555 (citations and footnote omitted).
Plaintiﬀs must provide “some further factual enhancement”
to take a claim of ﬁduciary duty violation from the realm of
“possibility” to “plausibility.” Id. at 557. “A claim has facial
plausibility when the plaintiﬀ pleads factual content that al-
lows the court to draw the reasonable inference that the de-
fendant is liable for the misconduct alleged.” Iqbal, 556 U.S. at
678. So for Counts III and V, plaintiﬀs must have alleged
enough facts to show that a prudent ﬁduciary would have
taken steps to reduce fees and remove some imprudent in-
vestments.
 A ﬁduciary’s actions may give rise to diﬀerent infer-
ences—some that suggest a breach of ﬁduciary duty and oth-
ers that do not. While Hughes did not expressly address how
we are to resolve such varying inferences on a motion to dis-
miss, the Court directed us to apply the pleading standard
discussed in Iqbal and Twombly. Hughes, 142 S. Ct. at 742. The
alternative inference that can arise from ﬁduciary conduct is
analogous to the “obvious alternative explanation” that the
Court in Twombly accounted for when assessing telephone
carriers’ parallel conduct in an antitrust action. 550 U.S. at
567–68. There, the Court highlighted “[t]he inadequacy of
showing parallel conduct or interdependence,” which “with-
out more” would be equally “consistent with conspiracy” as
18 No. 18-2569

it is with a “rational and competitive business strategy unilat-
erally prompted by common perceptions of the market.” Id.
at 554. This suggests that something “more,” id., is necessary
to survive dismissal when there is an obvious alternative ex-
planation that suggests an ERISA ﬁduciary’s conduct falls
within the range of reasonable judgments a ﬁduciary may
make based on her experience and expertise. Hughes, 142 S.
Ct. at 742.
 In Iqbal, the Supreme Court reaﬃrmed that obvious
alternative explanations should be accounted for when con-
sidering constitutional claims alleging that federal oﬃcials
unlawfully discriminated against the plaintiﬀ by detaining
him. 556 U.S. at 682. There, too, the Court ruled that the
Pakistani Muslim plaintiﬀ had not overcome the obvious al-
ternative explanation that he had been arrested because of his
suspected link to the 9/11 attacks rather than because of “pur-
poseful, invidious discrimination.” Id. Twombly and Iqbal
establish that an obvious alternative explanation for a defend-
ant’s conduct that precludes liability can undermine the
claim’s plausibility. Id. at 682; Twombly, 550 U.S. at 567. But
neither do these cases say a plaintiﬀ must conclusively rule
out every possible alternative explanation for a defendant’s
conduct, no matter how implausible. Only obvious alternative
explanations must be overcome at the pleadings stage, and
only by a plausible showing that such alternative explana-
tions may not account for the defendant’s conduct. Accord-
ingly, whether a claim survives dismissal necessarily depends
on the strength or obviousness of the alternative explanation
that the defendant provides.
 Other circuits are in accord that every possible alternative
explanation for an ERISA ﬁduciary’s conduct need not be
No. 18-2569 19

ruled out at the pleadings stage. Forman, 40 F.4th at 452–53
(“The theory merely provides a competing inference for why
TriHealth oﬀered retail-class funds,” but “the facts of another
complaint might suggest an alternative explanation that ren-
ders implausible an inference of imprudence.”); Sacerdote v.
N.Y. Univ., 9 F.4th 95, 108 (2d Cir. 2021); Davis, 960 F.3d at 483
(“WashU has identiﬁed one plausible inference, but it is not
the only one.”); Sweda, 923 F.3d at 326; Braden v. Wal-Mart
Stores, Inc., 588 F.3d 585, 597 (8th Cir. 2009).
 Northwestern contends that we should not rely on
Sacerdote and Sweda because in those cases the courts failed to
require the plaintiﬀs to rule out every possible alternative ex-
planation for an ERISA ﬁduciary’s conduct. See Sacerdote, 9
F.4th at 108; Sweda, 923 F.3d at 326 (citing Braden, 588 F.3d at
597). For this reason, Northwestern suggests those cases were
not decided under the Twombly pleading standard. But
Twombly and Iqbal provide that only obvious alternative ex-
planations should be accounted for at the dismissal stage. See
Twombly, 550 U.S. at 567; Iqbal, 556 U.S. at 682. These cases did
not hold that every possible alternative explanation must be
conclusively ruled out on the pleadings to state a claim. The
Third Circuit in Sweda and the Second Circuit in Sacerdote—as
well as the other circuits cited above—rejected the reading of
Twombly and Iqbal that Northwestern advances here. Sweda,
923 F.3d at 326; Sacerdote, 9 F.4th at 108.
 Where alternative inferences are in equipoise—that is,
where they are all reasonable based on the facts—the plaintiﬀ
is to prevail on a motion to dismiss. See Forman, 40 F.4th at 450
(“Equally reasonable inferences … could exonerate TriHealth
… [b]ut at the pleading stage, it is too early to make these
judgment calls.”). This is because, at the pleadings stage, we
20 No. 18-2569

must accept all well-pleaded facts as true and draw reasona-
ble inferences in the plaintiﬀ’s favor. Taha v. Int’l Bhd. of
Teamsters, Loc. 781, 947 F.3d 464, 469 (7th Cir. 2020) (citation
omitted); Davis, 960 F.3d at 483. A court’s role in evaluating
pleadings is to decide whether the plaintiﬀ’s allegations are
plausible—not which side’s version is more probable. See
Twombly, 550 U.S. at 556. Thus, on a motion to dismiss, courts
must give due regard to alternative explanations for an ERISA
ﬁduciary’s conduct, Hughes, 142 S. Ct. at 742, but they need
not be overcome conclusively by the plaintiﬀ.
 Sometimes an alternative explanation for an ERISA ﬁdu-
ciary’s conduct may be patently more reasonable and better
supported by the facts than any theory of ﬁduciary duty vio-
lation pleaded by a plaintiﬀ. In such a scenario, courts should
not hesitate to dismiss an ERISA claim for breach of the duty
of prudence. This will often be the case where a plan ﬁduciary
has actually performed the requisite diligence in monitoring
plan expenses and fund prudence. If a plan ﬁduciary suﬃ-
ciently monitors funds and expenses, its informed course of
action is much more likely to be within “the range of reason-
able judgments a ﬁduciary may make based on her experience
and expertise.” Hughes, 142 S. Ct. 737 at 742.
 To plead a breach of the duty of prudence under ERISA, a
plaintiﬀ must plausibly allege ﬁduciary decisions outside a
range of reasonableness. See Hughes, 142 S. Ct. at 742. How
wide that range of reasonableness is will depend on “‘the cir-
cumstances ... prevailing’ at the time the ﬁduciary acts.”
Dudenhoeﬀer, 573 U.S. 409, 425 (citing 29 U.S.C.
§ 1104(a)(1)(B)). The discretion accorded to an ERISA ﬁduci-
ary “will necessarily be context speciﬁc.” Id.
No. 18-2569 21

 Often, as here, the ERISA fiduciary will defend against al-
legations of breach of duty by arguing that the course of ac-
tion the plaintiff says the fiduciary should have taken was not
available. Under this reasoning, Northwestern argues plain-
tiffs must plead that a prudent alternative action was “actu-
ally available.” This is a variant of the alternative explanation
defense. That a prudent alternative action was unavailable, of
course, can explain the fiduciary’s failure to take that action.
 We see no reason to treat this alternative explanation dif-
ferently than any other. To the extent that the prudent course
of action was unavailable, that will foreclose the claim. But if
a course of action was only possibly unavailable, further fac-
tual development on the pleadings will be necessary to re-
solve the claim on that explanation. The actual availability
that Northwestern asks us to incorporate into the pleading
standard goes beyond the plausibility standard of Iqbal and
Twombly. “[A] well-pleaded complaint may proceed even if it
strikes a savvy judge that actual proof of those facts is improb-
able … .” Twombly, 550 U.S. at 556. At the pleadings stage, a
plaintiﬀ must provide enough facts to show that a prudent
alternative action was plausibly available, rather than actually
available.
 IV. Analysis
 We now evaluate Counts III and V of the First Amended
Complaint under the pleading standard for the duty of pru-
dence.
 A. Count III—Excessive Recordkeeping Fees
 Plaintiﬀs pleaded that Northwestern incurred unreasona-
ble recordkeeping fees by failing to monitor and control those
expenses. Per plaintiﬀs, the university should have reduced
22 No. 18-2569

its fees by soliciting bids from competing providers, negotiat-
ing with existing recordkeepers for fee reductions, and con-
solidating to a single recordkeeper.
 This court previously aﬃrmed dismissal on Count III be-
cause: (1) ERISA does not require a ﬂat-fee structure;
(2) Northwestern explained that it retained TIAA as a sepa-
rate recordkeeper so it could continue oﬀering TIAA’s popu-
lar Traditional Annuity; and (3) plan participants could keep
recordkeeping expenses low by selecting low-cost funds,
which were made available through the Plans. Divane, 953
F.3d at 989–90, 991 n.10. As discussed earlier, Hughes fore-
closes the third reason for the prior decision. 142 S. Ct. at 742
(rejecting this court’s reliance on plan participant control over
funds selection). As for the second, the desire to retain the Tra-
ditional Annuity among plan oﬀerings is an alternative expla-
nation that we assess under our newly formulated pleading
standard. On the ﬁrst, Hughes left untouched the holding in
Hecker that the use of revenue sharing for plan expenses does
not amount to a per se violation of ﬁduciary duty under
ERISA. Hecker, 556 F.3d at 585. But just because a revenue-
sharing fee arrangement does not amount to a per se ERISA
violation does not also mean that using such an arrangement
in every case fulﬁlls the plan ﬁduciary’s duty of prudence.
Further analysis is warranted in light of the ERISA ﬁduciary’s
continuing duty to monitor plan expenses stated in Tibble, 575
U.S. 523.
 Recall that the duty of prudence includes a continuing
duty to monitor plan expenses and “incur only costs that are
reasonable in amount and appropriate” with respect to the
services received. Tibble, 843 F.3d at 1197. So, Count III’s sur-
vival depends on whether plaintiﬀs have pleaded suﬃcient
No. 18-2569 23

facts to render it plausible that Northwestern incurred unrea-
sonable recordkeeping fees and failed to take actions that
would have reduced such fees.
 To begin, plaintiﬀs alleged that the Plans together paid be-
tween four to ﬁve million dollars a year in recordkeeping fees
when, based on a $35 ﬂat fee per participant, a more reasona-
ble amount would have been about one million dollars. Plain-
tiﬀs assert that $35 was a reasonable per participant fee
“[b]ased on the Plans’ features, the nature of the administra-
tive services provided by the Plans’ recordkeepers, the num-
ber of participants in the Plans (approximately 30,000), and
the recordkeeping market.” In Albert, this court aﬃrmed dis-
missal of a similar claim in which the plaintiﬀ pleaded that
the relevant ERISA plan paid an average of $87 per participant
in recordkeeping fees despite a reasonable fee being $40 per
participant based on what comparator funds paid. 47 F.4th at
579. This court in Albert depended in large part on the previ-
ous holding in Divane that the defendant “was not required to
search for a recordkeeper willing to take $35 per year per par-
ticipant as plaintiﬀs would have liked.” Id. (citing Divane, 953
F.3d at 990–91). This holding remains correct, but Hughes di-
rects us to reconsider plaintiﬀs’ allegations concerning exces-
sive recordkeeping fees given the continuing duty to monitor
such fees stated in Tibble, 575 U.S. 523. We reaﬃrm that a ﬁ-
duciary need not constantly solicit quotes for recordkeeping
to comply with his duty of prudence with respect to plan ex-
penses. See Hecker, 556 F.3d at 586; Loomis, 658 F.3d at 670. But
a ﬁduciary who fails to monitor the reasonableness of plan
fees and fails to take action to mitigate excessive fees may vi-
olate the duty of prudence.
24 No. 18-2569

 Further, Albert emphasized the lack of “allegations as to
the quality or type of recordkeeping services the comparator
plans provided.” Id. at 579. This court cited two Sixth Circuit
cases, Smith v. CommonSpirit Health, 37 F.4th 1160, 1169 (6th
Cir. 2022), and Forman, 40 F.4th at 449, for the rule that claims
alleging excessive recordkeeping fees fail when ERISA plain-
tiﬀs do not plead that the fees were excessive in relation to the
services provided. Albert, 47 F.4th at 580. But in aﬃrming dis-
missal, Albert left open the possibility “that recordkeeping
claims in a future case could survive the ‘context-sensitive
scrutiny of a complaint’s allegations’ courts perform on a mo-
tion to dismiss.” Id. (citing Dudenhoeﬀer, 573 U.S. at 425). The
pleadings here lead us down that diﬀerent path.
 Unlike in Albert, plaintiﬀs here assert “[t]here are numer-
ous recordkeepers in the marketplace who are equally capable
of providing a high level of service to large deﬁned contribu-
tion plans like the Plans.” So, plaintiﬀs maintain that the qual-
ity or type of recordkeeping services provided by competitor
providers are comparable to that provided by Fidelity and
TIAA. Plaintiﬀs also plead that because recordkeeping ser-
vices are “commoditized … recordkeepers primarily diﬀeren-
tiate themselves based on price, and will aggressively bid to
oﬀer the best price in an eﬀort to win the business, particu-
larly for jumbo plans like the Plans.” In short, plaintiﬀs allege
that recordkeeping services are fungible and that the market
for them is highly competitive. Plaintiﬀs also contend that $35
per participant was a reasonable recordkeeping fee based on
the services provided by existing recordkeepers and the
Plans’ features. Unlike the plaintiﬀs in CommonSpirit Health,
plaintiﬀs plead that the fees were excessive relative to the
recordkeeping services rendered. See 37 F.4th at 1169.
No. 18-2569 25

 Plaintiﬀs also provide examples of several other university
I.R.C. § 403(b) plans that successfully reduced recordkeeping
fees by soliciting competitive bids, consolidating to a single
recordkeeper, 4 and negotiating rebates. Plans oﬀered by
Loyola Marymount University, Pepperdine University, Pur-
due University, and California Institute of Technology suc-
cessfully lowered recordkeeping fees by consolidating
recordkeepers, according to plaintiﬀs. Purdue and CalTech
leveraged plan assets to lower fees by negotiating for a ﬂat
administrative fee structure and revenue-sharing rebates, re-
spectively. Plaintiﬀs also cite industry experts who recom-
mended soliciting bids for recordkeeping and consolidating
to a single recordkeeper to reduce overall fees.
 Per plaintiﬀs, despite these recognized beneﬁts, North-
western neglected to monitor its recordkeeping fees under its
revenue-sharing fee arrangement. Instead, the university
continued to contract with TIAA and Fidelity instead of con-
solidating, did not conduct competitive bidding for record-
keeping services, and failed to use the Plans’ size to negotiate
rebates from existing providers. Plaintiﬀs also pleaded that
Northwestern successfully lowered the Plans’ administrative
fees (including recordkeeping fees) in the October 2016 re-
structuring, which suggests that Northwestern’s recordkeep-
ing fees were unreasonably high and that means to lower such
fees were available. Under the context-speciﬁc pleading
standard speciﬁed above, all these factual averments lead us
to conclude that plaintiﬀs have plausibly alleged that

 4 Consolidation of recordkeepers was not at issue in Albert, 47 F.4th

570.
26 No. 18-2569

Northwestern violated its duty of prudence by incurring un-
reasonable recordkeeping fees.
 Northwestern responds that these pleadings fail to state a
claim because plaintiﬀs have not demonstrated that consoli-
dating to a single recordkeeper was an available alternative or
that an alternative recordkeeper would have accepted a lower
fee than that paid to Fidelity or TIAA. But under the pleading
standard, plaintiﬀs have suﬃciently alleged that record-
keeper consolidation and soliciting an equally capable but
lower-cost recordkeeper were available options. Plaintiﬀs
point to other institutions that had successfully consolidated
and reduced fees. And they maintain that the market is com-
petitive with equally capable recordkeepers who can provide
comparable services for less.
 Requiring plaintiﬀs to prove that another recordkeeper
would have oﬀered a lower fee or that consolidation was
actually available would apply Dudenhoeﬀer’s heightened
pleading standard, rather than the lower Twombly and Iqbal
plausibility requirement. The Supreme Court in Hughes di-
rected us to examine the duty of prudence in light of context,
Hughes, 142 S. Ct. at 742 (citing Dudenhoeﬀer, 573 U.S. at 425),
but Dudenhoeﬀer’s pleading standard does not extend beyond
ESOPs. At the pleadings stage, plaintiﬀs were required to
plausibly allege that Northwestern’s failure to obtain compa-
rable recordkeeping services at a substantially lesser rate was
outside the range of reasonable actions that the university
could take as plan ﬁduciary. They have done so.
 Northwestern oﬀers alternative explanations for its failure
to consolidate recordkeepers and to switch to a per capita fee
arrangement. The university posits that dropping TIAA as a
recordkeeper would remove the popular Traditional Annuity
No. 18-2569 27

from the Plans and that retaining TIAA as sole recordkeeper
would have compromised the Plans’ ability to oﬀer Fidelity
investments. Northwestern also highlights that TIAA
imposes a penalty for withdrawing investments in the Tradi-
tional Annuity. Although these are reasonable alternative
explanations, they do not explain why the university did not
negotiate with TIAA and Fidelity to lower fees for plan par-
ticipants, whether through rebates or a modiﬁed fee arrange-
ment. Count III is not limited to a failure to consolidate
recordkeepers. It includes a claim that Northwestern failed to
mitigate excessive recordkeeping fees in several ways.
 Northwestern also argues that plaintiﬀs failed to address
the fact that a per capita fee would discourage small investor
participation. But neither has the university shown why en-
couraging small participant investment is worth charging an
alleged four to ﬁve times in recordkeeping fees to plan partic-
ipants. An equally, if not more, plausible inference would be
that the university neglected to keep its recordkeeping fees
paid through revenue sharing at a reasonable level. North-
western’s alternative explanations are not strong enough to
justify dismissal of the recordkeeping claim on the pleadings.
See Forman, 40 F.4th at 450; Davis, 960 F.3d at 483. So, we hold
that plaintiﬀs have pleaded a plausible claim in Count III.
 * * *
 We are not alone in our conclusion on this type of claim.
Two circuits have ruled against dismissing similar claims that
alleged a failure to lower recordkeeping expenses. See Davis,
960 F.3d at 482–83; Sweda, 923 F.3d at 330–31. The Second Cir-
cuit also recognized that consolidating recordkeepers may re-
duce fees, but that court aﬃrmed dismissal of a similar claim
28 No. 18-2569

because the plan ﬁduciary consolidated recordkeepers within
a reasonable time. Sacerdote, 9 F.4th at 119–20.
 In reaching this conclusion, we reiterate that the inquiry
into the duty of prudence is in all cases “context speciﬁc.”
Hughes, 142 S. Ct. at 742 (quoting Dudenhoeﬀer, 573 U.S. at
425). Claims for excessive recordkeeping fees in a future case
may or may not survive dismissal based on diﬀerent plead-
ings and the speciﬁc circumstances facing the ERISA ﬁduci-
ary. But here, plaintiﬀs have pleaded enough to cross the line
from possibility to plausibility.
 B. Count V—Imprudent Fund: Share-Class Claim
 Plaintiﬀs also contend Northwestern “selected and re-
tained for years as the Plans’ investment options mutual
funds and insurance company variable annuities with high
expenses and poor performance relative to other investment
options that were readily available to the Plans at all relevant
times.” At bottom, Count V alleges imprudent fund retention.
As part of this claim, plaintiﬀs said Northwestern retained
multiple duplicative funds that caused plan participant con-
fusion and inaction. We address that contention separately in
Section IV.C. Plaintiﬀs also allege that the Plans included
“mutual funds and variable annuities with retail expense ra-
tios far in excess of other lower-cost options available to the
Plans.” To plaintiﬀs, this and other pleadings state a claim
that Northwestern breached its duty of prudence by failing to
replace retail-class shares of funds with cheaper but otherwise
identical institutional-class shares.
 Northwestern disputes that Count V includes such a
share-class claim. But the university construes Count V too
narrowly and skips over many allegations in plaintiﬀs’ First
No. 18-2569 29

Amended Complaint that support a share-class claim. In ad-
dition to the pleadings already cited, plaintiﬀs maintain that
institutional and retail shares diﬀer only in that retail shares
have higher expenses. They allege that although institutional
shares have minimum investment thresholds, it is common
for large plans to obtain waivers for such requirements. Plain-
tiﬀs claim that jumbo deﬁned-contribution plans like North-
western’s had “massive bargaining power” that enabled them
to obtain such a waiver from fund managers. In support,
plaintiﬀs state that other ﬁduciaries had successfully negoti-
ated for including institutional-class shares in their plans de-
spite not meeting the minimum investment requirements.
 Importantly, in Hughes the Supreme Court identiﬁed a
share-class claim in Count V, namely that Northwestern had
“oﬀered a number of mutual funds and annuities in the form
of ‘retail’ share classes that carried higher fees than those
charged by otherwise identical ‘institutional’ share classes of
the same investments.” 142 S. Ct. at 741. That share-class
claim is separate from the duplicative funds claim, also in
Count V, that we discuss later in Section IV.C. This court pre-
viously aﬃrmed dismissal of Count V because Northwestern
provided some of the low-cost index funds that plaintiﬀs
sought. Divane, 953 F.3d at 991. The Supreme Court rejected
that reasoning, Hughes, 142 S. Ct. at 740, so we reexamine the
pleadings in light of the continuing duty to monitor plan in-
vestments outlined in Tibble, 575 U.S. 523. Under that stand-
ard, we conclude that the share-class claim survives.
 Plaintiﬀs’ share-class pleadings are similar to those in
Tibble. Plaintiﬀs alleged that Northwestern retained more ex-
pensive retail-class shares of 129 mutual funds when, by us-
ing Northwestern’s size and correspondent bargaining
30 No. 18-2569

power, less expensive but otherwise identical institutional-
class shares were available to the Plans. Similarly, in Tibble
petitioners “argued that respondents acted imprudently by
oﬀering six higher priced retail-class mutual funds as Plan in-
vestments when materially identical lower priced institu-
tional-class mutual funds were available.” 575 U.S. at 525–26.
“[E]xpress[ing] no view on the scope of respondents’ ﬁduci-
ary duty,” the Court remanded the case. Id. at 531.
 On remand, the Ninth Circuit restated much of the Su-
preme Court’s clariﬁcation on the continuing duty to monitor
and remanded for reconsideration of the district court’s bench
trial ﬁndings on the share-class claim. Tibble, 843 F.3d at 1199.
In turn, the district court found, for all mutual funds at issue,
that “no prudent ﬁduciary would purposefully invest in
higher cost retail shares” and granted judgment for the plain-
tiﬀs. Tibble v. Edison Int’l, No. CV 07-5359 SVW (AGRx), 2017
WL 3523737, at *12 (C.D. Cal. Aug. 16, 2017). It follows from
the similarity of the share-class claim in Tibble with the allega-
tions here that this claim should survive dismissal.
 Northwestern argues plaintiﬀs have not pleaded that in-
stitutional-class shares were actually available to the Plans.
The university points out that access to institutional-class
shares often requires signiﬁcant minimum investment by in-
vestors. To Northwestern, plaintiﬀs provide merely naked as-
sertions that the university could have obtained waivers of
these investment minimums. But as described above, under
Twombly and Iqbal, a plaintiﬀ is required to show only that
such cheaper institutional shares were plausibly available.
Northwestern has contended that the institutional shares are
only possibly unavailable. We cannot determine on the plead-
ings, for example, whether the university had tried to bargain
No. 18-2569 31

with existing fund providers for access to institutional-class
shares but failed. Nor can we discern whether Northwestern
ever considered the possibility of access to institutional shares
for its plan participants.
 To the contrary, plaintiﬀs plausibly allege that waivers of
investment minimums were possible, and that Northwestern
could have negotiated for institutional-class shares. These al-
legations are substantiated by statements from industry ex-
perts that jumbo retirement plans like Northwestern’s have
massive bargaining power. Plaintiﬀs noted the district court’s
ﬁnding in the proceedings prior to Tibble, 575 U.S. 523, that it
is “common for investment advisors representing large 401(k)
plans to call mutual funds and request waivers of the invest-
ment minimums so as to secure the institutional shares.” Tib-
ble v. Edison Int’l, No. CV 07-5359 SVW(AGRx), 2010 WL
2757153, at *9 (C.D. Cal. July 8, 2010). They also highlighted
how other large I.R.C. § 403(b) plans had leveraged plan as-
sets to bargain for access to institutional-class shares and cited
one speciﬁc example of a plan doing so. These allegations ren-
der it plausible that institutional-class shares were available
to Northwestern.
 Northwestern also contends that retail-class shares are su-
perior to institutional-class shares because their higher fees
allow plans, through revenue sharing, to pay for recordkeep-
ing and other administrative expenses—a feature, it argues,
that encourages small plan participants to invest. In Loomis,
this court considered a similar alternative explanation in fa-
vor of revenue sharing over per capita fee arrangements. See
658 F.3d at 672 (“[F]or … others with small investment bal-
ances, a capitation fee could work out to more, per dollar un-
der management … .”). This is just one possible explanation
32 No. 18-2569

for why Northwestern chose to retain such a large number of
retail-class shares. But this explanation is not so much more
obvious than plaintiﬀs’ account that this issue can be resolved
on the pleadings. Plaintiﬀs allege that Northwestern failed to
consider bargaining for cheaper institutional-class shares
with existing fund providers to the detriment of plan partici-
pants. Plaintiﬀs’ version is especially plausible in light of their
allegation that the Plans collectively paid about four to ﬁve
times as much in recordkeeping fees as they should have.
 In Loomis, this court also noted other advantages that re-
tail-class shares could oﬀer in contrast to institutional-class
shares: Pooled investment in institutional shares “lacks the
mark-to-market benchmark provided by a retail mutual
fund” and so imposes greater diﬃculties in valuing the in-
vestment relative to market. Id. Further, institutional shares
are less liquid than retail shares, which allow daily transfers.
Id. Even more, this court observed that the average expense
ratio of institutional shares in equity funds was higher than
any of the retail shares oﬀered to the plaintiﬀ plan partici-
pants. Id. This was to show that the relevant plan in Loomis
had competitively priced retail shares compared to institu-
tional shares on average.
 These other claimed advantages of retail shares appear no-
where in the pleadings or the parties’ briefs. Instead, plaintiﬀs
maintain that the institutional shares in question are identical
to corresponding retail shares in terms of investment and
management. The only diﬀerence, plaintiﬀs allege, is that re-
tail shares charge signiﬁcantly higher fees.
 In this respect, plaintiﬀs’ share-class claim is special in that
the comparator action that a prudent ﬁduciary should have
taken—replacing retail shares with institutional shares—is
No. 18-2569 33

baked into the claim. See Forman, 40 F.4th at 451 (“Diﬀerent
ERISA claims have diﬀerent requirements, to be sure. But this
claim has a comparator embedded in it.”); Sacerdote, 9 F.4th at
108 (observing that the plaintiﬀs alleged that a “superior al-
ternative investment”—institutional shares—was apparent
by simply reviewing the fund prospectus); Davis, 960 F.3d at
483–87 (analyzing comparator benchmark funds for an alleg-
edly underperforming fund but not for a share-class claim on
the same fund).
 Northwestern’s alternative explanations about the una-
vailability of institutional-class shares or the advantages of
using higher revenue-sharing payments in retail shares to de-
fray recordkeeping costs, could explain Northwestern’s fail-
ure to swap out its retail for institutional shares. But based on
the facts pleaded, these alternative inferences are not strong
enough to overcome the equally, if not more, reasonable in-
ference that Northwestern failed to use its size to bargain for
cheaper institutional shares. Drawing these reasonable infer-
ences in plaintiﬀs’ favor, they have plausibly alleged that
Northwestern’s failure to swap out retail-class for institu-
tional-class shares was outside the range of reasonable deci-
sions a ﬁduciary could take. So, we hold that plaintiﬀs have
stated a share-class claim in Count V.
 * * *
 Five other circuits—four since Divane—have joined in this
conclusion to uphold similar share-class claims against dis-
missal. See Forman, 40 F.4th at 450 (recognizing “[e]qually rea-
sonable inferences” from the facts on why a ﬁduciary would
choose retail over institutional shares, but acknowledging
that “at the pleading stage, it is too early to make these judg-
ment calls”); Kong v. Trader Joe’s Co., No. 20-56415, 2022 WL
34 No. 18-2569

1125667, at *1 (9th Cir. Apr. 15, 2022); Sacerdote, 9 F.4th at 108;
Davis, 960 F.3d at 483 (observing that a failure to negotiate
aggressively enough or to negotiate at all for lower-cost alter-
natives is enough to state a claim for a breach of the duty of
prudence); Sweda, 923 F.3d at 331–32.
 C. Count V—Imprudent Fund: Duplicative Funds Claim
 As stated earlier, we see a separate claim in Count V that
Northwestern breached its duty of prudence by retaining
multiple duplicative funds. Plaintiﬀs claim that the excessive
options in the Plans caused “decision paralysis” and led to in-
vestor confusion.
 To the extent investor confusion is the injury pleaded, the
First Amended Complaint does not identify how plaintiﬀs
were confused and personally injured by the multiplicity of
funds. This court’s prior opinion aﬃrmed that plans may gen-
erally oﬀer a wide range of investment options and fees with-
out breaching any ﬁduciary duty. Divane, 953 F.3d at 992
(citing Loomis, 658 F.3d at 673–74; Hecker, 556 F.3d at 586).
Hughes left this general principle untouched. Unspeciﬁc alle-
gations that a ﬁduciary provided too many funds, without
more, do not state a claim for breach of the duty of prudence.
So, we aﬃrm dismissal of the duplicative funds claim in
Count V that is based on a theory of investor confusion.
 Plaintiﬀs also maintained that consolidating duplicative
investments of the same style into a single investment option
would have allowed the Plans to obtain lower-cost invest-
ments—such as low-cost institutional shares of the fund. In-
deed, the pleadings on the October 2016 restructuring suggest
that Northwestern accomplished just that. To the extent the
allegations for the duplicative funds claim support the share-
No. 18-2569 35

class claim, on remand the district court may consider them
on the Count V share-class claim.
 V. Conclusion
 For the reasons stated, we REVERSE the district court’s dis-
missal of the excessive recordkeeping fees claim in Count III
and the share-class claim in Count V of the First Amended
Complaint, and REMAND for further proceedings. For all other
claims and issues, we reinstate this court’s judgment in
Divane, 953 F.3d 980, and we AFFIRM the district court’s dis-
missal of Plaintiﬀs’ First Amended Complaint on all other
counts and AFFIRM the denial of Plaintiﬀs’ requests for leave
to further amend the complaint and for a jury trial.