# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-3345

_____

Latasha Davis, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan; Jennifer Elliott, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan; Marla Aliece Sims-King, Individually and as a Representative of a Class of Participants and Beneficiaries in and on Behalf of Washington University Retirement Savings Plan

*Plaintiffs - Appellants*

v.

Washington University in St. Louis; Washington University in St. Louis Board of Trustees

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 25, 2019
Filed: May 22, 2020

_____

Before KELLY, MELLOY, and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Three retirement-plan participants sued Washington University in St. Louis for breach of its fiduciary duties under the Employee Retirement Income Security Act, more commonly known as ERISA. The district court dismissed their complaint for failure to state a claim. We affirm in part, reverse in part, and remand for further proceedings.

## I.

This case is just one in a series of actions filed against some of the nation's largest universities for alleged mismanagement of their section 403(b) retirement-savings plans. *See, e.g.*, *Divane v. Nw. Univ.*, 953 F.3d 980 (7th Cir. 2020); *Sweda v. Univ. of Pa.*, 923 F.3d 320 (3d Cir. 2019); *see also* 26 U.S.C. § 403(b)(1)(A) (authorizing "educational organization[s]" to create these tax-sheltered "annuity" plans). Latasha Davis and the other plaintiffs in this case have alleged in their complaint that the plan offered to Washington University ("WashU") employees is just too expensive and offers too many poorly performing investment options. By mismanaging its plan in these two ways, the plaintiffs say, WashU has breached the fiduciary duties it owed to plan participants under ERISA.

With about 24,000 participants and $3.8 billion in assets, the WashU plan is one of the largest of its kind in the country. It is a defined-contribution plan, which is a type of retirement account funded by contributions from the employee, the employer, or both. The account's value depends on the amount of those contributions, plus any earnings from the underlying investments, minus the fees charged. In this type of plan, participants retain the ability to select their own investments from a menu of options. The risk of loss, however, remains with them, meaning that underperformance or excessive fees will chip away at their returns. *See* John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* 175–76 (8th ed. 2010).

WashU's plan includes approximately 115 options from two investment firms, the Teachers Insurance and Annuity Association of America-College Retirement Equities Fund ("TIAA") and Vanguard. Both firms receive compensation for their services through the fees they charge, which fall into two major categories. The first are investment-management fees, which cover the operating costs of the individual investments in a participant's portfolio. *See* Emp. Benefits Sec. Admin., U.S. Dep't of Labor, *Understanding Retirement Plan Fees and Expenses* 4 (Dec. 2011). Along with any trading costs, these are generally expressed as an expense ratio: the amount of fees charged as a percentage of the total assets invested. The size of the expense ratio varies based on a host of factors unique to each investment, such as the size of the fund, the frequency of trading, and the complexity of its holdings. *See id.* at 4, 9.

The other category of fees is different. Administrative or record-keeping expenses pay for the day-to-day operations of the plan itself, *id.* at 3, which in this case used to be the responsibility of both firms, though today only TIAA provides those services across the entire plan. Some plans charge a flat fee to cover these expenses. Under this model, participants pay the same amount regardless of how much money they have invested in the plan. *Id.* Others, including WashU, bundle investment-management and administrative fees together. In this type of arrangement, called a "revenue sharing" model, participants effectively pay a pro rata share of administrative expenses based roughly on how much they have invested. *See id.*

The plaintiffs' complaint contains two separate breach-of-fiduciary-duty claims. The first alleges that WashU allowed both types of fees to get out of control. The second asserts that it kept several underperforming investments in the plan for

too long.  The district court granted WashU's motion to dismiss both claims.  *See* Fed. R. Civ. P. 12(b)(6).[1]

## II.

We review the dismissal de novo, "accepting as true the allegations . . . in the complaint and drawing all reasonable inferences in favor of the nonmoving party." *Star City Sch. Dist. v. ACI Bldg. Sys., LLC*, 844 F.3d 1011, 1016 (8th Cir. 2017).  To survive a motion to dismiss, a complaint must contain "sufficient factual matter" to state a facially plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

ERISA imposes certain duties on fiduciaries like WashU.  One is that they must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  This statutory duty of prudence establishes "an objective standard" that focuses on "the process by which" decisions are made, "rather than the results of those decisions."  *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (citations omitted).  A prudently made decision is not actionable, in other words, even if it leads to a bad outcome.  *Id.*

It is important to keep in mind, however, that this case is only at the pleading stage.  At this point, the complaint only needed to give the district court enough "to *infer* from what is alleged that the process was flawed."  *Id*. at 596 (emphasis added).  It did not have to go further and "*directly* address[] the [actual] process by which the [p]lan was managed."  *Id*. (emphasis added).  "[C]ircumstantial allegations about

---

[1]The district court also dismissed two other claims, both suggesting that the plan and TIAA had entered into prohibited transactions with each other.  *See* 29 U.S.C. § 1106(a)(1)(B), (D).  The dismissal of these claims is not before us, however, because the plaintiffs have opted not to pursue them on appeal.

[the fiduciary's] methods" based on the "investment choices a plan fiduciary made" can be enough. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018).

A.

The first claim clears this pleading hurdle. It alleges that fees were too high and that WashU should have negotiated a better deal.

Perhaps the clearest example is Vanguard's "mixed" lineup of funds. By mixed, we mean that there were different share classes in its lineup, including "institutional" and "retail" shares. For some investments, Vanguard offered lower-cost institutional shares, which have higher initial investment requirements. Instead of offering these shares across its entire lineup, however, it offered retail shares for other funds, even though minimum investment requirements are "routinely waived" for individual investors in large retirement-savings plans. The failure to replace these shares with their lower-cost counterparts breached WashU's fiduciary duty, in the plaintiffs' view, because higher fees led to lower overall returns. They believe, in other words, that WashU's lack of diligence cost them money.

We allowed similar allegations to proceed in *Braden*. *Braden* involved a retirement-savings plan filled with retail shares despite "a very large pool of assets" and a "highly competitive" marketplace. 588 F.3d at 595. Taken together, we concluded that these facts were enough to create an inference of a "flawed" process, even if the complaint itself did not "directly address[]" how the plan made its selections. *Id.* at 596.

We reach the same conclusion here. The complaint alleges that the marketplace for retirement plans is competitive, and with $3.8 billion invested, WashU's "pool of assets" is large. From these facts, two inferences of mismanagement are plausible from WashU's failure to offer more institutional shares. The first is that it failed to gain access to them because, as the complaint

-5-

alleges, it did not negotiate aggressively enough with Vanguard. The second is that it was asleep at the wheel: it failed to pay close enough attention to available lower-cost alternatives. Either way, a "failure of effort [or] competence" is enough to state a claim for breach of the duty of prudence. *Id.*

WashU has two responses. One is that a plan without retail shares would not have covered the plan's costs because, according to WashU, institutional shares do not make large enough revenue-sharing payments. The other is that, with a more competitive marketplace and growth in the plan's total assets, it has demonstrated diligence by shifting into more institutional shares over time. Taken together, it says, the only plausible inference is that it has prudently managed the plan by negotiating for the best possible deal under the circumstances.

WashU has identified one plausible inference, but it is not the only one. On a motion to dismiss, we must draw every reasonable inference in favor of the plaintiffs. *See Sabri v. Whittier All.*, 833 F.3d 995, 998 (8th Cir. 2016). So the fact that mismanagement is another plausible inference means that this claim cannot end here. *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1130 (8th Cir. 2012) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007))).[2]

B.

We reach the opposite conclusion on the other claim, which puts the spotlight on three specific investment options. According to the complaint, WashU should have jettisoned them because they were poor performers and cost too much.

---

[2]The complaint also includes a number of other allegations, but it is not necessary to address them in light of our conclusion that the plaintiffs have otherwise alleged enough for this claim to survive.

A fiduciary can breach its duty of prudence if it fails to monitor and remove imprudent investment options. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). It is no defense to simply offer a "reasonable array" of options that includes some good ones, *see Tussey v. ABB, Inc.*, 746 F.3d 327, 335–36 (8th Cir. 2014), and then "shift[]" the responsibility to plan participants to find them. *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009).

For an investment-by-investment challenge like this one, a complaint cannot simply make a bare allegation that costs are too high, or returns are too low. *Meiners*, 898 F.3d at 822. Rather, it "must provide a sound basis for comparison—a meaningful benchmark." *Id.* In *Braden*, a combination of a "market index and other shares of the *same* fund" met this requirement, but there is no one-size-fits-all approach. *Id.* (emphasis added) (discussing *Braden*, 588 F.3d at 595–96). Plausibility depends on the "totality of the specific allegations in [each] case." *Id.* (citation omitted).

1.

The first investment is TIAA Real Estate Account. According to the prospectus, its "principal strategy is to purchase *direct* ownership interests in income-producing real estate, primarily office, industrial, retail and multi-family properties."[3] (Emphasis added). In other words, its holdings consist of numerous individual *properties* like malls, office buildings, and apartment complexes.

The complaint points to another plan offering—the Vanguard REIT Index Fund—as a possible benchmark, but it is different. In contrast to TIAA Real Estate

---

[3]Like the district court, we consider the relevant fund prospectuses and plan disclosure documents because they are "embraced by the pleadings." *Meiners*, 898 F.3d at 823.

Account's direct-purchasing strategy, Vanguard REIT Index Fund "employs an indexing investment approach designed to track the performance" of an index "composed of *stocks* of publicly traded equity real estate investment trusts." (Emphasis added). It invests in intermediaries, various real-estate companies, which in turn manage a portfolio of actual real-estate assets. TIAA Real Estate Fund, by contrast, just cuts out the middleman and holds the real-estate assets itself. This is the first difference between the two investments.

The second is that their management approaches differ. TIAA Real Estate Account is actively managed—meaning that professional investment managers try to beat the market through picking individual investments—and Vanguard REIT Index Fund is not. *See* Downes & Goodman, *supra*, at 9–10. In fact, the latter is indexed, which is a form of passive management that tries to mimic a market index, in this case one full of real estate investment trusts. *See id.* at 342. Some investors like having direct exposure to real estate, and analysts continue to debate whether active or passive management is a better approach. *See generally* Dan M. McGill et al., *Fundamentals of Private Pensions*, 788–89 (8th ed. 2005) (discussing the advantages and disadvantages of index funds).

It is true that some analysts think it is better for investors to put their money in real estate investment trusts rather than real estate itself. And it might even be better still to do so through an index fund rather than an actively managed portfolio. But it is not imprudent for a fiduciary to provide both investment options. *See Meiners*, 898 F.3d at 823–24. They have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other. *See id.* at 823.

2.

The second investment is CREF Stock Account, which "invests at least 80% of its assets in [a] broadly diversified portfolio of common stocks." It is a variable

annuity, which is technically an insurance contract, but it behaves similarly to a mutual fund. As the value of the underlying holdings goes up, so does the price of the contract. *See* Downes & Goodman, *supra*, at 808.

Once more, the complaint points to index funds as a potential benchmark. Yet again, the complaint is comparing apples and oranges. Index funds are passively managed, whereas CREF Stock Account has an actively managed component. In fact, it uses a "combination" of management strategies, including a "proprietary, quantitative modeling" approach with "mathematical models and computer programs" in an effort to beat the market. The biggest difference, however, is that variable annuities can provide a steady stream of income at retirement—what TIAA calls "income for your life"—and mutual funds do not. Even if stock index funds will typically outperform a variable annuity like CREF Stock Account, as the complaint alleges, it is not imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others.[4] *See Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011).

In one last effort to find a truly comparable benchmark, the complaint also points to three actively managed funds: Vanguard PRIMECAP, Vanguard Capital Opportunity, and Vanguard Diversified Equity. They are closer, but not close enough. CREF Stock Account has holdings from around the globe, with around

---

[4]The complaint claims that the relevant market is captured by the Russell 3000 Index, which tracks the 3,000 largest stocks in the United States by market capitalization. The plan disclosures treat this index as a close "broad-based securities market ind[ex]." *See* 29 C.F.R. § 2550.404a-5(d)(1)(iii). Nevertheless, we are not persuaded that the Russell 3000 Index, standing alone, is a "meaningful benchmark" in this breach-of-fiduciary-duty case. *Meiners*, 898 F.3d at 822. After all, it is not a fund, much less an actively managed one, and it does not offer the security of an income stream for life. *Cf. Braden*, 588 F.3d at 595–96 (considering a comparison to market indices as one factor among many in allowing a breach-of-fiduciary-duty claim to proceed).

30% of its portfolio invested in international securities. The other funds, by contrast, have a lower percentage of international stocks. With such a comparatively large portion of its portfolio in international stocks, CREF Stock Account is essentially a one-stop shop for those investors who want broad exposure to both domestic *and* international equities. This does not mean it is necessarily better or worse. It is just different, even if it has "some similarit[ies]." *Meiners*, 898 F.3d at 823 (explaining that plaintiffs may not "dodge the requirement for a meaningful benchmark by merely finding a less expensive alternative fund or two with some similarity").

Moreover, even if one of these other actively managed funds were an appropriate benchmark, the complaint fails to connect the dots in a way that creates an inference of imprudence. There is no question, as the complaint alleges, that CREF Stock Account performed more poorly than they did over certain periods of time. But fiduciaries are not required to pick "the *best* performing fund." *Id.* (emphasis added). Nor are they required to pick the *lowest*-cost fund, particularly when the expense-ratio differences are small—here, between just .06 and .11 percentage points. *See id.* ("[T]he existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice."); *Braden*, 588 F.3d at 596 n.7 ("[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund." (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009))). The bottom line is that there is simply not enough in the complaint to infer that a reasonably prudent fiduciary would have refused to stick with CREF Stock Account.[5]

---

[5]The complaint also references an analyst report from March 2012 that "recommend[s] termination of . . . investments" in CREF Stock Account. This report reflects just one analyst's opinion from a single snapshot in time, however, and on its own terms is conditional on "consideration of any annuity contract provisions or guarantees" between TIAA and participating plans.

3.

The final investment is distinct from everything else in WashU's plan. It also happens to be the most popular option. TIAA Traditional Annuity, which is a fixed-annuity contract, promises a guaranteed stream of payments for life at retirement. Unlike a variable-annuity contract, in which the size of the payments depends in part on the performance of the underlying securities, TIAA bears any downside risk by guaranteeing a fixed minimum return. *Compare* Downes & Goodman, *supra*, at 268, *with id.* at 808.

Despite these advantages, the complaint stresses one important drawback: how difficult it is to pull money out. A withdrawal or transfer is paid in ten annual installments, unless the participant is willing to pay a "substantial penalty," or in the event of termination of employment, a 2.5% surrender charge.

In light of this drawback, the complaint alleges that WashU should not have offered TIAA Traditional Annuity as an option.[6] Yet again, the complaint fails to provide a meaningful benchmark. *See Meiners*, 898 F.3d at 822. It does not identify even one other investment with a similar risk-and-reward profile that offers better terms than TIAA Traditional Annuity.

A unique investment option like this one shows why a meaningful benchmark is so important. Some investors are perfectly willing to trade liquidity and higher returns for reduced risk and guaranteed income. At a minimum, a prudent fiduciary can offer them that choice. *See Renfro*, 671 F.3d at 327 (concluding that "[a]n

---

[6]The plaintiffs also suggest that offering it was imprudent because it violates a regulation limiting compensation for services provided to ERISA plans. *See* 29 U.S.C. § 1108(b); 29 C.F.R § 2550.408b-2(c)(3). They forfeited this argument, however, by failing to make more than a passing reference to it in their opening brief. *See Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 634 (8th Cir. 2007) (noting that "points not meaningfully argued in an opening brief" are deemed abandoned).

ERISA defined contribution plan is designed to offer participants meaningful choices about how to invest their retirement savings").

## III.

We affirm in part, reverse in part, and remand for further proceedings.

_____