*Singh v. Deloitte LLP*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2023

(Argued: May 24, 2024　　　Decided: December 10, 2024)

No. 23-1108

_____

RUPINDER SINGH, individually and on behalf of all others similarly situated, JEFFREY S. POPKIN, individually and on behalf of all others similarly situated, JONI WALKER, individually and on behalf of all others similarly situated, JENNY MARK, individually and on behalf of all others similarly situated,

Plaintiffs-Appellants,

-v.-

DELOITTE LLP, THE BOARD OF DIRECTORS OF DELOITTE LLP, THE RETIREMENT PLAN COMMITTEE OF DELOITTE LLP, JOHN DOES 1-30,

Defendants-Appellees.

_____

Before:　　　LIVINGSTON, Chief Judge, NARDINI, and ROBINSON, Circuit Judges.

Participants in Deloitte LLP's defined-contribution, 401(k) retirement plan brought a putative class action against plan fiduciaries, alleging breach of fiduciary duty in violation of the Employee Retirement Income Security Act (ERISA). The United States District Court for the Southern District of New York (Koeltl, *J.*) dismissed the action and subsequently denied Plaintiffs' motion for

leave to file an amended complaint on futility grounds.  We conclude that the district court did not err in concluding that Plaintiffs failed plausibly to allege that the Plan's administrative and recordkeeping fees were excessive and that Defendants breached their duty of prudence by not obtaining lower fees. Accordingly, we **AFFIRM** the judgment of the district court.

Judge Robinson concurs in part, and concurs in the judgment, in a separate opinion.

| | |
|---|---|
| FOR PLAINTIFFS-APPELLANTS: | MARK K. GYANDOH, Capozzi Adler, P.C., Merion Station, PA. |
| FOR DEFENDANTS-APPELLEES: | MICHAEL E. KENNEALLY (Jared R. Killeen, *on the brief*, Morgan, Lewis & Bockius LLP, Philadelphia, PA) Morgan, Lewis & Bockius LLP, Washington, DC. |

DEBRA ANN LIVINGSTON, *Chief Judge*:

Plaintiffs Rupinder Singh, Jeffrey Popkin, Joni Walker, and Jenny Mark, individually and on behalf of a putative class (collectively, "Plaintiffs"), appeal from a judgment entered on July 5, 2023 by the United States District Court for the Southern District of New York (Koeltl, *J.*).  The court denied Plaintiffs' motion for leave to file an amended complaint and entered final judgment on the ground that further amendment of the complaint would be futile because Plaintiffs' amended complaint, like the original, fails plausibly to allege that defendants Deloitte LLP ("Deloitte"), the Board of Directors of Deloitte LLP (the "Board"), and the Retirement Plan Committee of Deloitte LLP (the "Committee") (collectively, "Defendants") violated the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1001 *et seq.*, by breaching their fiduciary duties in managing

2

an employee retirement plan.[1]  In the underlying action, Plaintiffs, Deloitte employees during the putative class period, sued Defendants, fiduciaries of the Deloitte 401(k) Plan (the "Plan"), for allegedly violating their duty of prudence by failing adequately to manage the Plan's recordkeeping and administrative fees, which resulted in the payment of excessive fees by Plan participants.  Reviewing the proposed amended complaint *de novo*, we agree with the district court that Plaintiffs have failed to plead sufficient factual matter to support a plausible inference that Defendants breached their duty of prudence.  Accordingly, we AFFIRM.

## BACKGROUND

### I. Factual Background[2]

Like many companies, Deloitte offered its employees the opportunity to participate in voluntarily-established retirement plans, including the 401(k) Plan at issue here, which is a "defined contribution plan" under ERISA § 3(34), 29 U.S.C. § 1002(34), in which all regular full-time employees who are not principals, partners, or managing directors at Deloitte could participate.[3]  Under the Plan's

---

[1] The district court's July 5, 2023 decision followed its January 13, 2023 memorandum opinion and order, which granted Defendants' motion to dismiss Plaintiffs' original complaint but permitted Plaintiffs to move to file an amended complaint if they could explain how doing so would cure the defects warranting dismissal.

[2] Unless otherwise noted, the factual background presented here is drawn from the First Amended Complaint ("FAC").

[3] Deloitte also offered another retirement plan, the Deloitte Profit Sharing Plan ("PSP Plan"), a defined-contribution, profit-sharing plan in which partners, principals, and managing directors could

terms, participating employees could elect to contribute from one to sixty percent of their compensation to the Plan, up to the maximum contribution permitted pursuant to the Internal Revenue Code. Deloitte would make a matching contribution of twenty-five percent of the employee's contribution, so long as the amount did not exceed six percent of the employee's annual compensation. Pursuant to the terms of the Plan, participants elected to have these contributions invested in a range of investment options.

Plaintiffs allege that the Plan's quantity of assets under management rendered it a "jumbo" plan in the defined contribution plan marketplace. Between 2015 and 2019, the Plan had between 62,114 and 81,639 participants with account balances. During the putative class period, from October 13, 2015 through the date of judgment ("Class Period"), the Plan had at least $4.2 billion in assets under management, including over $7.3 billion at the conclusion of fiscal year 2020.

The Plan incurred various expenses associated with its administration, including for services provided by third parties. During the Class Period, Vanguard provided recordkeeping and administrative services to the Plan. Plaintiffs allege that the Plan covered Vanguard's fees both directly, through

participate. Plaintiffs challenge only the Defendants' conduct in managing the fees associated with the 401(k) Plan.

4

payments from Plan assets, and indirectly, in a practice known as revenue sharing, from Plan investments. Plan participants paid an annual fixed sum each year for recordkeeping services, which the Plan assessed as a quarterly charge against each participant's account.

Plaintiffs, participants in the Plan during the Class Period, allege that "[n]early all recordkeepers in the marketplace offer the same range of services and can provide the services at very little cost," that "[n]umerous recordkeepers . . . are capable of providing a high level of service and will vigorously compete to win a recordkeeping contract for a jumbo defined contribution plan," and that there are "essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power" offered "by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan."[4] FAC ¶¶ 66–69. Additional ancillary services are "normally charged" only to participants who use them. FAC ¶ 69.

Plaintiffs claim that the recordkeeping costs for their Plan were higher than for comparable peer plans. They allege that from 2015 to 2019, the Plan's

[4] As recounted by the district court, these include "basic account recordkeeping; multi-channel participant and plan sponsor access; daily participant transaction accounting; payroll service; participant tax reporting services; participant confirmations, statements, and standard notices; plan-level reporting and annual financial package; participant education; and plan consulting." *Singh v. Deloitte LLP (Singh II)*, No. 21-cv-8458 (JGK), 2023 WL 4350650, at *1 (S.D.N.Y. July 5, 2023) (citing FAC ¶ 68).

recordkeeping cost per participant ranged from $59.58 to $70.31, as compared to six other plans with at least 30,000 participants, for which the cost per participant in 2019 ranged from $21 to $34. Plaintiffs allege that they paid excessive recordkeeping fees in connection with the Plan because Plan fiduciaries failed to "negotiate favorable rates" based on economies of scale. *See* FAC ¶ 74. Plaintiffs surmise that because the Plan has used Vanguard as its recordkeeper since 2004 and was allegedly paying excessive amounts during the Class Period, Defendants failed to "remain informed about overall trends in the marketplace" for recordkeeping fees by conducting a Request for Proposal process at reasonable intervals. FAC ¶¶ 79, 92. They claim that "the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost." FAC ¶ 113.

## II. Procedural History

Plaintiffs commenced this action on October 13, 2021 alleging, *inter alia*, that the recordkeeping fees charged by the Plan were excessive and that the Defendants had breached their duty of prudence in managing the Plan. Defendants promptly filed a motion to dismiss. The district court granted the motion on the ground that Plaintiffs failed plausibly to allege that the Plan's recordkeeping fees "were

6

excessive relative to the services rendered." *Singh v. Deloitte LLP (Singh I)*, 650 F. Supp. 3d 259, 266 (S.D.N.Y. 2023) (internal quotation marks omitted). The complaint, the district court observed, "must allege more than just that the 401(k) Plan's recordkeeping fees were higher than those of other plans." *Id.* Accepting as true Plaintiffs' allegation that almost all recordkeepers offer the same range of services, the district court observed that "plaintiffs still do not allege, with specificity, what recordkeeping services the 401(k) Plan received from Vanguard," nor "what recordkeeping services the comparator plans received . . . ." *Id.* at 267. The court also noted that Plaintiffs had "disingenuous[ly]" compared the Plan's combined direct and indirect costs for recordkeeping with only the direct costs of the comparator plans. *Id.* "Because the plaintiffs' comparison does not compare apples to apples, the comparison fails to indicate plausibly imprudence on the part of the defendants." *Id.*

Plaintiffs filed their FAC on February 27, 2023. The FAC included additional material detailed in the district court's July 5, 2023 memorandum opinion and order, including comparisons between the direct costs of the Plan and comparator plans, allegations that Defendants have sole possession of relevant Plan disclosures, and an expert declaration opining that the Plan charged excessive

7

recordkeeping and administrative fees. *Singh II*, 2023 WL 4350650, at *1–2 . Upon review of Plaintiffs' proposed amended complaint, the district court denied Plaintiffs' motion to amend on futility grounds, concluding that Plaintiffs had not cured the pleading deficiencies in their original complaint.

As to the comparison of the Plan's direct costs for recordkeeping with the direct costs of comparator plans, the district court noted that this comparison shed limited light on the plausibility of Plaintiffs' allegation that the Plan's *total* recordkeeping costs were excessive given, *inter alia*, that "plaintiffs' allegations highlight that a plan's indirect costs may range widely from year-to-year." *Id.* at *4. More generally, the district court concluded that the proposed amended complaint still lacked sufficient factual allegations regarding the type and quality of recordkeeping services provided by the Plan and its allegedly less-expensive comparators: "Without allegations comparing specifically the quality of services rendered, or the number of services provided, between the Plan and its comparators, the conclusory allegations that '[n]early all recordkeepers in the marketplace offer the same range of services' and '[n]umerous recordkeepers in

the marketplace are capable of providing a high level of service,'" failed to state a plausible claim.[5] *Singh II*, 2023 WL 4350650, at *4. This appeal followed.

## DISCUSSION

This Court reviews *de novo* the district court's decision to deny leave to amend a complaint due to futility. *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164 (2d Cir. 2015). Futility arises when a proposed amended complaint "could not withstand a motion to dismiss." *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In evaluating the proposed complaint, the Court must "construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Sacerdote v. New York Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1112 (2022). However,

---

[5] The district court also concluded that Plaintiff's reliance on the expert declaration of Francis Vitagliano at the motion to dismiss stage was improper, and that the Vitagliano declaration "is simply a conclusory statement of the plaintiff's argument and . . . does not move the allegations from possible to plausible." *Id*. at *5–*6. Plaintiffs do not meaningfully contest on appeal the district court's conclusion that their reliance on an expert declaration at the motion to dismiss stage was misplaced. Accordingly, we do not consider the declaration's contents nor review the district court's conclusion regarding the appropriateness of the declaration's attachment to the complaint. *See In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 276 ("[A]rguments not made in an appellant's opening brief are waived . . . ."(internal quotation marks omitted)).

9

"[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

ERISA fiduciaries must act prudently in managing an employee benefit plan, discharging their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person "acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The Supreme Court has interpreted ERISA's duty of prudence in light of the common law of trusts, explaining that "a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones."[6] *Hughes v. Northwestern Univ.* (*Hughes II*), 595 U.S. 170, 175 (2022) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530, (2015)). That said, the prudence inquiry is necessarily context specific and "the circumstances facing an ERISA fiduciary," often enough, "will implicate difficult tradeoffs." *Id.* at 177. Courts must therefore "give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id.* It is not "necessarily sufficient to show that better investment opportunities were available at the time of the relevant decisions." *Pension Ben.*

---

[6] Plaintiffs' claim of excessive fees constitutes an imprudent investment claim. *See Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 Fed. App'x 31, 33 (2d Cir. 2009) (per curiam).

10

*Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv.*

*Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citing *Braden v. Wal-Mart Stores, Inc.*,

588 F.3d 585, 596 n.7 (8th Cir. 2009)).

Evaluating the amended complaint in light of these standards, we agree

with the district court that the FAC fails to do more than allege conclusorily that

the Plan's recordkeeping fees exceeded those of a select handful among the many

other plans available on the market. But as we said in *Young*, plaintiffs need

plausibly to allege that challenged fees "were excessive relative 'to the services

rendered,'" or to provide allegations "concerning other factors relevant to

determining whether a fee is excessive under the circumstances." *Young*, 325 Fed.

App'x at 33 (citing *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d

Cir. 1982)).[7] For just as "the cheapest investment option is not necessarily the one

a prudent fiduciary would select," *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th

Cir. 2022), *reh'g denied*, No. 21-2789, 2022 WL 4372363 (7th Cir. Sept. 21, 2022), so,

---

[7] Plaintiffs contend that *Young* is inapposite because it applied the Investment Company Act ("ICA"). But the *Young* panel did not apply the ICA. The panel simply considered how courts applying that Act determine whether a fee is excessive to inform its consideration of a ERISA complaint alleging breach of fiduciary duty in the failure to prevent excessive recordkeeping fees. Moreover, *Young*'s observation that plaintiffs in such cases should provide sufficient context to support a plausible inference "that the fees were excessive relative to the services rendered," 325 Fed. App'x at 33, is simply common sense. *See Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 190 (3d Cir. 2024) ("Judges draw on 'common sense' when 'determining whether a complaint states a plausible claim for relief.'" (quoting *Iqbal*, 556 U.S. at 679) (alterations adopted)). A buyer cannot determine if he has paid too much for an item without knowing what it is that he purchased.

too, a prudent fiduciary might select a higher-priced recordkeeping arrangement depending on, *inter alia*, the nature and quality of the services provided. *Singh II*, 2023 WL 4350650, at *4. We thus examine recordkeeping complaints, as all complaints, for their context, to determine whether the facts alleged "give the kind of context that . . . move [the recordkeeping] claim from possibility to plausibility." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022). *See also Matney v. Barrick Gold of N.A.*, 80 F.4th 1136, 1149 (10th Cir. 2023) ("A court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists; rather, the complaint must state facts to show the funds or services being compared are, indeed, comparable."); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) ("[T]he way to plausibly plead a claim of this type is to identify similar plans offering the same services for less.").

Here, Plaintiffs allege next to nothing about the recordkeeping services provided by the Plan or by the six other large plans that the FAC cites as allegedly lower-priced comparators.[8] Nor do they provide allegations as to "other factors," as we put it in *Young*, "relevant to determining whether a fee is excessive under

---

[8] Two of the comparators, Kaiser Permanente Supplemental Savings and Retirement Plan and The Savings and Investment Plan [WPP Group], also use Vanguard for recordkeeping. But, without factual context, we have no reason to infer that the services provided by Vanguard to other plans are comparable.

12

the circumstances." *Young*, 325 Fed. App'x at 33. Thus, while the FAC conclusorily alleges that "[n]early all recordkeepers in the marketplace offer the same range of services," FAC ¶ 66, it is silent on the number of services actually provided by either the Plan or its alleged comparators. Similarly, the FAC asserts that "[n]umerous recordkeepers in the marketplace are capable of providing a high level of service," FAC ¶ 67, but "does not allege what level of service the Plan provided," nor "whether less expensive comparator plans provided a similar quality of service . . . ." *Singh II*, 2023 WL 4350650, at *4. Plaintiffs suggest that the absence of context in the FAC does not matter because "[t]he services chosen by a large plan do not affect the amount charged by recordkeepers for [the] basic and fungible services" that constitute "essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power." *Id.* ¶¶ 68, 70. But the FAC's own allegations, however sparse, show a range of recordkeeping fees even among the six large comparator plans, belying the implication that the allegation of a cost disparity alone, without some consideration of the surrounding context, categorically suggests imprudence. *See Matney*, 80 F.4th at 1148 (noting that while "there is no doubt a claim for breach of ERISA's duty of prudence can be based on allegations that the fees associated with

13

[a] defined-contribution plan are too high compared to available, cheaper options," plaintiff must allege a "meaningful benchmark" to raise inference of imprudence) (quoting *Meiners v. Wells Fargo & Company*, 898 F.3d 820, 822 (8th Cir. 2018)).[9]

Nor are our concerns allayed by the allegations that *are* included in the FAC regarding Plaintiffs' cost comparisons to other plans.  While we have recognized that "details about a fiduciary's methods and actual knowledge tend to be 'in the sole possession of [that fiduciary],'" it is also the case that "ERISA imposes extensive disclosure requirements on plan administrators."  *St. Vincent*, 712 F.3d at 719–20 (quoting *Braden*, 588 F.3d at 598).  And here, Plaintiffs do not appear to draw "apple-to-apple" comparisons even when relying on disclosure documents filed by the Plan and its alleged comparators – documents we properly consider here, when integral to the FAC.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (noting material "integral" to complaint is properly considered in resolving Rule 12(b)(6) motion).

---

[9] The concurrence relies on the Vitagliano declaration to conclude that Plaintiffs sufficiently alleged the scope and quality of services provided to comparator plans.  *See* Concurrence at 1–7.  Although we have found it permissible for "a plaintiff to bolster a complaint by including a nonconclusory opinion to which an expert may potentially testify," an opinion cannot "rescue" a deficient pleading.  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022).  As already noted, *see supra* note 5, the district court determined that Vitagliano's declaration is simply a "conclusory statement of the plaintiff's argument."  Even if we were to consider the declaration, we discern no error in this conclusion.

First, following the district court's criticism of the original complaint's comparison of the Plan's combined direct and indirect recordkeeping costs with solely the direct costs of comparator plans, the FAC compares the direct costs of the Plan with the direct costs of its six comparator plans. By omitting indirect costs from the analysis altogether, however, the FAC fails to compare total recordkeeping costs, which Plaintiffs allege comprise both direct and indirect fees. As the district court noted, the comparison of direct costs alone provides limited insight into whether *total* recordkeeping fees paid by the Plaintiffs were excessive, as compared to other plans. *Singh II*, 2023 WL 4350650, at *4.[10]

Next, the main comparison Plaintiffs make in the FAC is between the Plan's alleged direct recordkeeping costs per participant from 2015 to 2019 (ranging from $46.23 to $65.24 per participant annually) and the alleged direct recordkeeping costs per participant for the six other large plans in the year 2019 (ranging from $21 to $34 per participant annually). But Plaintiffs fail to explain why they compare the Plan's direct recordkeeping costs in each of five years to the comparator plans' direct recordkeeping costs from just 2019, without "otherwise consider[ing] or alleg[ing] any facts regarding possible differences in cost between

_____

[10] We note the concurrence agrees that Plaintiffs' complaint is deficient as to this comparison and therefore joins in the judgment. Concurrence at 1, 12.

2015 and 2019, the time period relevant to this case." *Singh II*, 2023 WL 4350650, at *4. This limits our ability to draw inferences about the fee differential over the course of the Class Period. [11]

Plaintiffs' remaining allegations also "fail[] to give the kind of context that could move this claim from possibility to plausibility." *Smith*, 37 F.4th at 1169. Plaintiffs first allege that the fact that the Plan remained with the same recordkeeper, Vanguard, since at least 2004 and paid allegedly "outrageous amounts for recordkeeping from 2015 to 2017" provides "little to suggest that Defendants conducted a [Request for Proposal] at reasonable intervals." FAC ¶ 92; *see* FAC ¶ 79. Yet this inference about the Defendants' decision-making process relies on the assumption that the Plan's recordkeeping fees were excessive relative to the services rendered, a proposition that the Plaintiffs have not adequately alleged. Next, Plaintiffs cite a stipulation from recordkeeper Fidelity in an unrelated suit, stating that the value of recordkeeping services provided by

_____

[11] In addition, Plaintiffs allege that they frame the allegations in their complaint in reliance on a number of available fee disclosures, including Section 404a disclosures and Form 5500s filed with the Department of Labor. FAC ¶ 86. Pursuant to Department of Labor regulations, Section 404a-5 disclosures provide plan participants with information regarding the annual fees charged for plan administrative services, including recordkeeping services. *See* 29 C.F.R. § 2550.404a-5. The 404(a) disclosures here, however, suggest that annual per-participant recordkeeping and other administrative fees for the Plan declined or stayed stagnant each year from 2015 ($40) to 2022 ($22), and were lower than the FAC's fee calculations. Supp. App'x 290, 304, 318, 330, 343, 356, 369, 450. We accept as true the FAC's allegations as to the Plan's direct recordkeeping costs, but note that this discrepancy goes unremarked in the FAC.

Fidelity to the plan in that litigation ranged from $14 to $21 per participant. But the FAC does not specify the recordkeeping services provided by Fidelity to its client, or otherwise provide sufficient context to infer that these services are comparable to the services that Vanguard provided here. Finally, Plaintiffs point to a 2020 market survey by consulting group NEPC, which allegedly shows that the majority of a sample of 121 plans with over 15,000 participants, across the corporate, healthcare, and "[p]ublic, [n]ot-for-[p]rofit and other" sectors, "paid slightly over $40 per participant" for recordkeeping and related fees. FAC ¶¶ 109–110. But this allegation, too, lacks sufficient context to infer that the services these plans provided are comparable to those provided by the Plan here, or that this sample otherwise provides a meaningful benchmark for use in assessing the Plan's recordkeeping fees over the course of the Class Period.

Plaintiffs contend that their complaint "easily satisf[ies] the pleading requirements of *Albert* and *Smith* as clarified by the Seventh Circuit in *Hughes*." Appellant's Br. at 36–37. We disagree. In *Hughes v. Northwestern University (Hughes III)*, the Seventh Circuit held that the plaintiffs there had adequately pleaded an ERISA imprudence claim based on excessive recordkeeping fees. 63 F.4th 615, 633 (7th Cir. 2023). But the *Hughes* complaint presents a different picture

17

than the one we are faced with here. *Hughes* concluded that plaintiffs pleaded a plausible claim of breach because they made *multiple* allegations relevant to concluding that the fee was excessive. The plaintiffs contended that "the quality or type of recordkeeping services provided by competitor providers [was] comparable to that provided by Fidelity and TIAA," the recordkeepers at issue. *Id.* at 632. The plaintiffs also pleaded that Northwestern had behaved imprudently by maintaining a second recordkeeper while other plans consolidated to a single recordkeeper for the same services. *Id.* And they provided concrete examples of other university plans "that successfully reduced recordkeeping fees by soliciting competitive bids, consolidating to a single recordkeeper, and negotiating rebates." *Id.* These specific allegations, considered together, provided a plausible "basis upon which to infer that" Northwestern paid excessive fees. *Young*, 325 Fed App'x at 33; *cf. Matousek*, 51 F.4th at 278 (noting that "key to nudging an inference of imprudence from possible to plausible is providing 'a sound basis for comparison . . .' not just alleging that 'costs are too high, or returns are too low'") (quoting *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). Plaintiffs' sparse allegations here are simply not comparable. *See Young*, 325 Fed. App'x at 33 (noting importance of such context to plausibility determination).

18

Plaintiffs further urge that we reverse the district court "[b]ecause the [FAC] pleads similarly robust allegations" to the complaint in *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172 (3d Cir. 2024). Appellant's Fed. R. App. P. 28(j) Letter (May 17, 2024). Again, this is incorrect. The complaint in *Mator* pled with specificity the recordkeeping services provided by the Wells Fargo plan, as well as the similarity of these services to those provided by lower-priced comparators. For instance, the *Mator* plaintiffs specifically alleged that the price per person of total recordkeeping costs for Wells Fargo was three to four times that of five other plans serviced by Wells Fargo itself, even though these other plans received the "same services described in Paragraphs 93 and 94 [describing the plan's services provided to plaintiffs and other plan participants] and the same level and quality of service." Second Amended Compl., ¶ 105, *Mator v. Wesco Distrib. Inc.*, No. 2:21-cv-00403 (W.D. Pa. Apr. 21, 2022). The *Mator* complaint also compared the Wells Fargo plan's fees to those of 11 other plans serviced by several of the "top recordkeepers by number of plans for plans with assets in excess of $200 million," *id.* ¶ 107, which "all provided identical or similar services of the same quality" to those provided by Wells Fargo to the plan, *id.* ¶ 108.

In addition, the *Mator* plaintiffs provided a comparison of estimated *total* fees, as opposed to direct fees alone, and also specifically alleged "that either the Plan's 'direct fees alone' or its 'indirect fees alone' were 'unreasonable compared to the total fees . . . that other similar plans paid.'" *Mator*, 102 F.4th at 181. Moreover, the plaintiffs alleged that when the plan at issue there switched recordkeepers in 2020, it "paid a much lower flat fee . . . per participant" for the same services, delivered at the same level of quality. *Id*. As noted by the Third Circuit, the pleading thus contained a nonconclusory, fact-based allegation that:

> when the Plan switched to Fidelity for recordkeeping services, lowering fees from about $154 to $54 per participant, there was no change in the kind or quality of recordkeeping services provided to participants. In other words, Fidelity's services allegedly were as good as Wells Fargo's, but at a fraction of the price.

*Id*. at 189. The *Mator* court thus reached its conclusion that the fee comparisons at issue, considered in context, "nudge[d] the[] complaint across the line from conceivable to plausible," based on "a close examination of the complaint and attached documents." *Id*. at 185. Using the same approach and considering the lack of context and sparse specific factual allegations in the FAC, we reach a different result.

20

In sum, we agree with the district court that Plaintiffs' recordkeeping claim fails the "context-sensitive scrutiny of a complaint's allegations" that we are charged to perform on a motion to dismiss. *Dudenhoeffer*, 573 U.S. at 425. Absent greater specificity as to the type and quality of services provided by the Plan and its comparators – or absent other allegations providing the context that might move this recordkeeping claim "from possible to plausible," *Matousek*, 51 F.4th at 278 – Plaintiffs fail to state a claim for breach of the duty of prudence. Accordingly, this claim was properly dismissed.

Finally, Plaintiffs further charge that Deloitte and its Board failed adequately to monitor the other fiduciaries to ensure they adequately fulfilled their fiduciary obligations and properly managed the Plan in accordance with ERISA. Both parties agree, however, that this claim is derivative of the claim that Defendants violated the duty of prudence owed to Plan participants. *See Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 368 (2d Cir. 2014) (explaining that a failure to monitor claim "constitute[s] [a] derivative claim[] that cannot survive absent a viable claim for breach of a duty of prudence"). Because we agree with the district court that the fiduciary duty claim is properly dismissed, it follows that the motion to dismiss this derivative claim was also properly granted.

## CONCLUSION

For the foregoing reasons, we AFFIRM.

ROBINSON, *Circuit Judge*, concurring in part and concurring in the judgment.

I agree that if a plaintiff relies on market comparisons to support a claim based on circumstantial evidence that Plan Administrators have breached their duty of prudence by paying excessive recordkeeping fees, the comparisons must be apples-to-apples. Majority at 14-15. And I agree that Plaintiffs' allegations here are insufficient because comparing only the *direct* recordkeeping costs paid by the Plan to the direct costs paid by other plans, and omitting any comparison of *indirect* costs—that is, fees paid through revenue sharing—gives "limited insight into whether *total* recordkeeping costs paid by the Plaintiffs were excessive, as compared to other plans." *Id*. at 15.

But I part ways with the majority with respect to the sufficiency of Plaintiffs' allegations concerning the scope and quality of services provided to the respective comparator plans. In my view, the majority's analysis fails to "accept[] as true" the well supported factual allegations in the First Amended Complaint ("FAC") as to the bundle of recordkeeping services available to comparable Plans, the relationship between the mix of services provided and price, and the relative quality of those services. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In doing so, it imposes an unwarranted burden at the pleadings stage on

plaintiffs seeking to protect their rights under ERISA—a statute Congress intended to "function as a comprehensive remedial statute." *Allen v. Credit Suisse Securities (USA) LLC*, 895 F.3d 214, 223 (2d Cir. 2018) (internal quotation marks and citation omitted).

I reach this conclusion for several reasons.

First, Plaintiffs' First Amended Complaint[1] explains in a nonconclusory way, and with support from an expert declaration, *why* we can infer that the scope and quality of services provided to comparator plans are comparable to those of the Plan here for purposes of comparing the respective plans' relative costs.

As to the bundle of services provided, the FAC alleges that all national recordkeepers for large plans with substantial bargaining power, like the Plan, include the same suite of essential services:

    A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);

---

[1] Like the Majority, I draw from the allegations in Plaintiffs' First Amended Complaint. The Majority declines to consider the declaration of Plaintiffs' expert because Plaintiffs' opening brief did not contest the district court's observation that the declaration is "simply a conclusory statement of the plaintiff's argument." *See* Majority at 9 n.5 (quoting *Singh v. Deloitte LLP*, 21-cv-8458, 2023 WL 4350650, at *6 (S.D.N.Y. July 5, 2023)). Because the FAC relies extensively on the Declaration of Francis M. Vitagliano—which was filed as an exhibit to the FAC—I find it impossible to consider one without the other. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) ("[A] court may consider documents attached to the complaint as an exhibit or incorporated in it by reference.") (internal quotation marks and citation omitted).

B. Multi-channel participant and plan sponsor access (e.g. phone, web);

C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D. Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E. Participant tax reporting services (e.g., IRS Form 1099-R);

F. Participant confirmations, statements, and standard notices;

G. Plan-level reporting and annual financial package (excluding IRS Form 5500);

H. Participant education (e.g. newsletters, web articles, standard communication materials);

I. Plan consulting (e.g., preapproved document services, operational materials);

J. Plan consulting (e.g. preapproved document services, operational compliance support).

App'x 105-106 (FAC ¶ 68).

Critically, the FAC alleges that these services are offered by *all* recordkeepers in this class for one price, typically a per capita price, "regardless of the services chosen or utilized by the plan." App'x 106 (FAC ¶ 69). "Ancillary services," like "QDRO's, participant loans, and self-directed brokerage accounts are normally charged to only participants using those ancillary services." *Id.*

Moreover, "[a]lthough the 401(k) participant servicing can vary slightly in the various service levels, the actual cost to a large record keeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected . . ."

App'x 107-08 (FAC ¶ 74). "Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider." *Id.*

With respect to the quality of services provided, the FAC tells us that "[t]he recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena." App'x 112 (FAC ¶ 91); *see also* App'x 132-35 (Vitagliano Decl. at ¶¶ 29-38 (describing facts about the market for 401(k) recordkeeping services that inform these conclusions)).

In light of these allegations, I take issue with the Majority's assertion that "Plaintiffs allege next to nothing about the recordkeeping services provided by the Plan or by the six other large plans that the FAC cites as allegedly lower-priced comparators." Majority at 12. Plaintiffs have alleged that the class of recordkeepers that provide services to plans like the Plan and the identified comparators offer the same suite of specified services, and they've told us what those services are. And they have alleged that the actual price these large recordkeepers charge a Plan does not depend on the specific services elected. In short, the FAC asserts that significant pricing differences in recordkeeping fees in

4

plans at this level cannot be attributed to variations in the bundles of services accepted by a given plan, and that a line-by-line comparison of the individual recordkeeping services actually adopted by each comparator plan with those used by the Plan here would tell us little about the relative differences in plan costs.

These allegations tell us all we need to know at the pleading stage to satisfy ourselves that Plaintiffs have alleged an apples-to-apples comparison with respect to the *scope* and *quality* of services provided to the Plan and the comparators.[2]  And the allegations, backed by the declaration of an expert with extensive experience in the relevant market who offers robust explanations for these conclusions, are far from the kind of "labels and conclusions" or "naked assertions" that we can properly disregard in assessing the sufficiency of a complaint.  *Iqbal*, 556 U.S. at 678 (alteration accepted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)).

In fact, the allegations here are *more* detailed than those the Seventh Circuit deemed sufficient to plausibly allege that recordkeeping fees were excessive relative to *services provided* in *Hughes v. Northwestern University*.  63 F.4th 615 (7th

---

[2] As noted above, I agree with the majority that the comparison as to price is not apples to apples.

Cir. 2023). In *Hughes*, the plaintiffs alleged, among other things, that fiduciaries of two Northwestern University retirement plans subject to ERISA breached the duty of prudence by incurring unreasonable recordkeeping fees. Plaintiffs alleged that Northwestern paid about four to five times a reasonable per-participant recordkeeping fee for the plans because it paid through uncapped revenue-sharing arrangements. They alleged that Northwestern should have lowered its expenses by consolidating from two recordkeepers to one, soliciting competitive bids, and using its size and bargaining power to negotiate for fee rebates. *See id.* at 621–22.

Relative to the services provided in exchange for the recordkeeping fees, the plaintiffs alleged that "[t]here are numerous recordkeepers in the marketplace who are *equally* capable of providing a high level of service to large defined contribution plans like the [Northwestern plans]" and that recordkeeping services are "commoditized" such that "recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for jumbo plans like the [Northwestern plans]." *Id.* at 632. The Seventh Circuit concluded that these

6

allegations were sufficient to plead that "the fees were excessive *relative to the recordkeeping services rendered*." *Id.* (emphasis added).

True, as the Majority notes, the Seventh Circuit also identified other features of Northwestern's plans—in particular, its reliance on two separate recordkeepers rather than one—to support that court's ultimate inference that Northwestern violated its duty of prudence. *Id.* But as to the question whether the complaint plausibly alleged that the recordkeeping fees were excessive *relative to the recordkeeping services rendered*—the primary issue the Majority highlights here—the court did not rely on these other considerations.

Second, we're at the pleadings stage. We must construe the complaint "liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff's favor." *Sacerdote v. New York University*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citation omitted). Though we have acknowledged that particular care is required to ensure that a complaint alleges "*nonconclusory* factual content raising a *plausible* inference of misconduct," we have also recognized that "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Id.* at 107 (emphasis in original) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent*

*Catholic Medical Centers Retirement Plan v. Morgan Stanley Investment Management Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).  And we have acknowledged that, "as is true in many contexts, a claim under ERISA may withstand a motion to dismiss based on sufficient circumstantial factual allegations to support the claim, even if it lacks direct allegations of misconduct."  *Id.* (citation omitted).  In short, there is not a heightened pleading standard for these kinds of ERISA claims.  *Id.* at 108 n.47 (noting that ERISA complaints are not subject to a heightened pleading standard, and that an ERISA plaintiff need not rule out lawful explanations for the defendant's conduct).

Moreover, even if, as noted below, some contexts call for particular caution in evaluating claims for breach of the duty of prudence under ERISA, the sensitivities underlying that guidance carry relatively little weight in the context of this challenge to recordkeeping costs.  Bear in mind, we have repeatedly emphasized that whether allegations establish a *plausible* rather than merely *possible* claim of breach of the duty of prudence is context specific.  *Sacerdote*, 9 F.4th at 108–09 ("[T]he assessment of any particular complaint is a 'context-specific task.'") (citation omitted); *Pension Ben. Guar. Corp.*, 712 F.3d at 718 ("'Determining whether a complaint states a plausible claim for relief is a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" (alterations accepted)) (quoting *Iqbal*, 550 U.S. at 679 (2009)).

So, for example, in assessing whether a pension fiduciary breached the duty of prudence by over-investing in high-risk investments including non-agency mortgage securities—a decision that proved ill-fated in the wake of the financial crisis that unfolded in 2008—we explained that the nature of the plaintiffs' allegations called for "particular care" in order to ensure that the complaint alleged *nonconclusory* facts raising a *plausible* inference of misconduct "and does not rely on 'the vantage point of hindsight.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (emphasis in original) (citation omitted).

The Plaintiffs here do not challenge the Plan fiduciaries' investment decisions or portfolio allocations—forward-looking decisions that require sometimes complex predictions about the future that can appear particularly unwise in the harsh light of hindsight. The decisions here involve recordkeeping fees—fees for managing the administrative side of the Plan. As set forth above, the services required are specified and predictable. So are the recordkeeping fees, which are a matter of contract. The only X factor is the portion of fees that

are paid through revenue sharing—that is, drawn from revenues from Plan investments. The actual cost of those fees cannot be predicted, though they can be significantly managed through advance negotiation. This is nothing like the complex forward looking investment decisions that may require "particular care" within the established motion-to-dismiss framework. *Id*.

Finally, as noted above, ERISA is a remedial statute. *Allen*, 895 F.3d at 223 ("Congress intended that ERISA function as a comprehensive remedial statute.") (internal quotation marks and citation omitted). We thus construe its terms liberally to effectuate its remedial purpose. *Id*. *See also Roberts v. Genting New York LLC*, 68 F.4th 81, 89 (2d Cir. 2023) ("Because it is a remedial statute, we construe the WARN Act's terms liberally.") (citation omitted); *N.C. Freed Co., Inc. v. Board of Governors of the Federal Reserve System*, 473 F.2d 1210, 1214 (2d Cir. 1973) ("Since the [Consumer Credit Protection Act] is remedial in nature, its terms must be construed in liberal fashion if the underlying Congressional purpose is to be effectuated.") (citing *Peyton v. Rowe*, 391 U.S. 54, 64–65 (1968); *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)). That makes sense. Congress enacted ERISA in part to protect the hard won earnings of ordinary people who have limited control over important decisions regarding what is for many their

most important asset. Courts should be loath to interpose undue obstacles in the path of plaintiffs seeking to protect their ERISA rights. *See also Pension Ben. Guar. Corp.*, 712 F.3d at 728 (Straub, J., dissenting in part) (noting concern that "heightened pleading requirements threaten to obstruct ERISA's remedial goals" because Congress intended ERISA's standards to be "enforced in part by private litigation") (citations omitted).

Plaintiffs here and in like cases have a tough row to hoe. In a world where recordkeeping fees are sometimes collected through a combination of direct charges and indirect revenue sharing, it's not at all clear whether and how they will be able to determine the total recordkeeping costs paid by comparator plans in order to plausibly state a circumstantial claim for breach of the duty of prudence based on comparisons to other plans. But in a world where the bundle of recordkeeping services available to a particular class of plans is predictable, and the range of services chosen by a plan has minimal impact on its actual recordkeeping costs—per Plaintiffs' allegations, the world we live in—the failure to itemize the specific services provided to the subject plan and each comparator does not defeat a circumstantial evidence-based claim of breach of the duty of prudence.

For these reasons, I concur in part and concur in the judgment.